Leland NEWMAN and Mildred Newman,
Plaintiffs-Respondents,

v.

CITY OF EL DORADO SPRINGS, Missouri,
Defendant-Appellant.

No. 7409.

Springfield Court of Appeals.

Missouri.

June 26, 1956.

Lynn M. Ewing, Ewing, Ewing & Ewing, Nevada, for defendant-appellant.

Morran D. Harris, John M. Belisle, Edwin W. Mills, Osceola, Horace S. Haseltine, Springfield, for plaintiffs-respondents.

RUARK, Judge.

Plaintiffs, respondents here, received jury award and judgment against the City of El Dorado Springs for $1,500 on account of damages suffered by them (in the years 1952 and 1953) because of the pollution of Clear Creek, allegedly resulting from the outfall and drainage from the El Dorado Springs sewer system.

The history and location of this sewer system as gathered principally from the defendant's evidence is that about the year 1903 the first and main line of the sewer was laid. This consisted of a 16- or 18-inch tile. A small stream, designated both as "Town Branch" and "Spring Branch," ran through the City of El Dorado Springs and carried the surface drainage from the town. The sanitary ·sewer line followed down the bank of Spring Branch for approximately three-quarters of a mile and then emptied into the stream. This outfall was located about a mile upstream from the confluence of Spring Branch with a stream known as Walnut Creek. Walnut Creek in turn (after a distance we do not find in the record) flows into Clear Creek. Clear Creek is a stream said to be 30–40 feet wide at water level and flows northwesterly past and along the boundary of the plaintiffs' land. The distance from El Dorado Springs to the plaintiffs' home is five and a half miles, but how far it is by the meanderings of the stream's course is not shown.

Over the years extensions and laterals were gradually added to the sewer line. Commencing about 1946 the city experienced considerable industrial growth which extended over the next several years. This growth included two milk plants, a shoe factory and a shirt factory, and the burden of the sewer system was considerably increased within a short period of time. In 1946 bonds were voted for the construction of a disposal plant, and this plant was thereafter builded. It was in partial operation in March of 1952, but only part of the facilities were installed and in use and the plant was not adequate to reduce the sewage. Inspections in September 1952 and January 1953 revealed substantially the same condition and raw sewage was still going into the stream. The installation of full equipment for proper operation was completed in May of 1954. Experts testified that this is a trickling type plant, which type, with all facilities installed and in proper operation, will remove from 90 to 93% of impurities. But the plant, when inspected in 1952 and 1953, was giving only about 30% treatment, with the remaining 70% going into the stream. Testimony was that the volume of pollution creates a greater burden on the stream, and that raw sewage creates a greater problem for a longer distance downstream than treated or partially treated sewage; that the effluent discharged into the stream is attacked by bacteria and the particles are gradually broken down into nutrients and this process uses up the oxygen in the water, but as the process of breaking down is accomplished the stream gradually returns to normal; that an adequate sewage plant would remove impurities so that the water could be used for livestock four or five miles downstream.

There was evidence that in the years prior to 1952 there had been noticeable pollution in Walnut Creek and there was some evidence of pollution in Clear Creek below the Walnut confluence, but there was no evidence of any pollution occurring down Clear Creek riparian to or within the immediate vicinity of the plaintiffs' farm until the year 1952, and plaintiff Leland Newman said that there was nothing wrong with the water at his place prior to that time.[1]

---

1. No doubt the first pollution of the stream to reach the vicinity of plaintiffs' land was occasioned by the shift from what was primarily domestic sewage to that which was predominantly from an industrial source. But whether this involved any legal change (as distinguished from a mere increase) in the burden placed upon the stream is not the question here.

Plaintiffs testified that they operated a farm, 85 acres of which was bottom alongside the creek extending for a distance of one-half mile; that they first noticed pollution in Clear Creek in May 1952, when the fish began to die; that the color of the water became bluish black, had a rotten stink; that the aquatic life died; the odor was so strong that it made plaintiff Leland Newman sick when he tried to work the land nearby; that the stench penetrated the home (one-half mile from the creek) and it was necessary to keep the doors and windows closed; that the flies became bad; that one cow died from drinking the water and that others got sick and poor and they finally had to remove them from the pasture; that they had to haul water for the stock. They offered some figures showing loss in feed and pasture, in milk production and in sales of stock. The case was submitted to the jury upon an instruction which permitted recovery for odors and stench, for loss of income in respect to plaintiffs' milk herd, for extra expense occasioned in care of their herd and for inconvenience and expense in having to haul water.

Appellant's assignments of error are directed at error in overruling defendant's motions for directed verdict and in giving plaintiffs' instruction on the measure of damages, because (a) a city sewer system and pollution caused thereby is a permanent nuisance; (b) the measure of damages is the difference in market value of the lands before and after; and (c) the city had the right to construct the sewer. Also assigned are error in admitting evidence in regard to the construction of the sewage treatment plant, the inadequate treatment of sewage and the effect of a properly constructed and operated plant on the discharge therefrom. Defendant's assignments also set up the statute of limitations.

Practically all of these assignments can be determined by the answer to the question: *Was the injury complained of the result of a permanent or a temporary nuisance?*

A municipality has the right to condemn, and the right to appropriate under eminent domain, the use of a water course for the purpose of disposal of its raw sewage, also the treated liquids and solids which may be a product of the operation of a sewage plant. The acts of the municipality in the exercise of this appropriation may or may not result in a nuisance inflicted upon the riparian owners below, and if such nuisance results because of the acts (or failure to act) of the municipality as a part of, concurrent with or following such appropriation, the riparian owner has a cause of action for the injury suffered.[2] If the nuisance so created necessarily follows and is an inherent and permanent result of the operation, then it is merged with and a part of the taking and becomes a part of the appropriation, and the measure of damage is the diminution of the value of the land affected. In such instance the cause of action accrues when the injury to the land becomes reasonably apparent, and the one action catches up and concludes all question of damages, because diminution in the value of the land takes into account not only all injuries which have been suffered by it in the past but also all those which it will, in reasonable contemplation, suffer in the future.[3]

If, however, the nuisance so created is not the necessary and inherent result of the operation, but the causes thereof are those which occur from the improper management or the failure to use facilities which are reasonably available, and they are therefore reasonably remediable, re-

---

2. Riggs v. City of Springfield, 344 Mo. 420, 126 S.W.2d 1144, 122 A.L.R. 1496.

3. Stewart v. City of Springfield, 350 Mo. 234, 165 S.W.2d 626; Smith v. Sedalia, 244 Mo. 107, 149 S.W. 597; King v. City of Rolla, 234 Mo.App. 16, 130 S.W.2d 697.

movable or abatable, then it is but temporary and the right of action in the riparian owner arises each time the nuisance is imposed upon him, and the measure of damages is the extent of the damage resulting from that particular occasion.[4]

The Missouri courts have heretofore held that a nuisance which results and follows from the turning of sewage into a water course is permanent, and the law of eminent domain applies instead of the law of nuisance. Hence, the landowner's one and only right of action accrued at a time when the injury became apparent, and the measure of damages was the difference in the market value of the land before and after. But the reason for such rule was that when it came into being a municipal sewer *was* necessarily, because of the inherent nature of the operation, a permanent nuisance. There were then no means and methods for the elimination and disposal of obnoxious solids, liquids and gases. With the advance of science, however, such is no longer the case and the employment of modern mechanical and chemical processes makes it possible to eliminate the greater part of what was, in the days of our fathers, a natural, fixed and *necessary* consequence of the operation of a municipal sewer. Having regard to present day sewer construction, it should not be said (as an all-inclusive statement) that the inevitable, necessary and inherent result is a nuisance to the land below, except the lands in the vicinity thereof and such as will, in reasonable contemplation, be permanently affected by it.[5] What we have said seems to be supported by the holdings in the majority of courts,[6] and we believe it is now

to be the law in Missouri. Such was indicated in Stewart v. City of Springfield, 350 Mo. 234, 165 S.W.2d 626, loc. cit. 631, as follows: "If a sewer system were to be constructed today, with modern and efficient equipment available for purifying the sewage, a different rule might probably apply." And the fact that a city sewer nuisance is now abatable has some support in Clark v. City of Springfield, Mo.App., 241 S.W.2d 100, 108.

But there is *still* the question in this case of whether or not, the right to dump sewage having been appropriated about the year 1903 at a time when the (unqualified) rule of permanency and necessity therefor did exist, the rights of the parties were then fixed. It is appellant's contention that when the sewer was first constructed and the city commenced its operation by dumping sewage into the stream it then and there appropriated the right to use such stream for such purpose "from the sewer outlet to the ocean," that such appropriation was permanent, that nuisances created by city sewers were then permanent, that the cause of action arose at that time and is now barred by the statute of limitations, but in any event, if not so barred, the measure of damages is the difference in value before and after. Respondents, on the other hand, commit themselves to the proposition that this was a temporary nuisance. We can agree with the appellant that if a permanent nuisance then resulted to burden the use and enjoyment of the land involved the rights were then fixed, and the mere fact that the city has subsequently been able to lessen the effect of the nuisance would not

4. 66 C.J.S., Nuisances, § 5, pp. 735, 736; 39 Am.Jur., Nuisances, secs. 132 and 133, p. 393 et seq.; Shelley v. Ozark Pipe Line Corp., 327 Mo. 238, 37 S.W.2d 518, 75 A.L.R. 1316; see Clark v. City of Springfield, Mo.App., 241 S.W.2d 100, 108.

5. Joyce on Nuisances, sec. 297, p. 389 et seq.; see Fair and Geyer, Water Supply and Waste Water Disposal, 21–8, 21–9.

6. City of Harrisonville v. W. S. Dickey Clay Mfg. Co., 289 U.S. 334, 53 S.Ct. 319, 77 L.Ed. 1208; Oklahoma City v. West, 155 Okl. 63, 7 P.2d 888; see Conestee Mills v. City of Greenville, 160 S.C. 10, 158 S.E. 113, 75 A.L.R. 519 (and annotations at 529) for a review of authorities.

destroy or change the right acquired by the city in the first instance.[7]

But we are of the opinion that appellant's contention overlooks the fact that no part of the land was "taken" until there was some interference with its use and enjoyment.

The assertion of the technical right to use the stream and the injury we call a nuisance which may result from such appropriation are two separate things, although they usually go together. The appropriation is the taking of the right to use the stream not only for the emptying of substances which may create a nuisance, but also for those which do not offend but perhaps may increase the flow or burden of the stream.[8] The nuisance which may or may not result follows from the acts of the city in its method of applying such use. The appropriation of the right to create a nuisance, if it can be called a right, could not occur and did not occur as an intrusion upon the use of any certain and particular riparian land until a nuisance was created *which affected such land*. While the city may have had the right, in the abstract, to use the force of the water and action of gravity from the sewer outlet to the gulf, it had no power to claim the right to create a nuisance except in so far as it could actually and in a physical sense produce such nuisance. The sovereign or an agent of the sovereign may by condemnation proceedings determine the necessity, and the extent of the necessity, for the taking of private property for public use; but an appropriation by the sovereign or its agent in the sense used

here comes about not by any forms or processes in law, as in condemnation, but as an inherent attribute of sovereignty, and it can be expressed only by an actual and physical taking and the appropriation must be such as interferes in some manner with the use and enjoyment of the property.[9] In order to make the appropriation there must be more than the existence of a possibility that some fifty years hence the city may find it advantageous to create a nuisance at any point from one to one hundred miles downstream.

Also (or perhaps we are stating the same thing in another way) the nuisance resulting from the appropriation becomes merged into and a part of the appropriation only when it is inherently permanent. The permanency there involved is the permanency of the invasion by interference with use, not of the assertion of an abstract right to burden the stream. No nuisance becomes permanent against any certain tract of land until there is a nuisance. No cause of action could accrue for the maintenance of a nuisance until the nuisance existed.[10] If we should say that in 1903 there was a taking of a right which would enable the city to maintain a nuisance which affected the land involved (when in fact the use of such land was in no wise interfered with), then we would in practical effect be saying that the city could and did have the right to appropriate by placing a burden upon a man's land without the obligation to pay just compensation and without actual remedy or recompense in the owner.[11]

7. Riggs v. City of Springfield, 344 Mo. 420, 126 S.W.2d 1144, 122 A.L.R. 1496, and annotations at 1509.

8. See Fansler v. City of Sedalia, 189 Mo. App. 454, 176 S.W. 1102, 1104.

9. See definitions of "Taking," Vol. 41, Words and Phrases; Lewis, Eminent Domain, 3rd ed., vol. 1, sec. 65(56); Nichols on Eminent Domain, 3rd ed., vol. 3, sec. 8.5(1), p. 21, vol. 4, sec. 12.23(1),

p. 46; 18 Am.Jur., Eminent Domain, sec. 132, p. 757.

10. 39 Am.Jur., Nuisances, sec. 141, p. 401; see Person v. City of Independence, Mo. App., 114 S.W.2d 175, 179.

11. And if we say that the right to burden the use of the land was taken (permanently) in 1903, but the cause of action did not accrue until the injury first occurred in 1952, then *who* would bring the action?

In the instant case the land of the plaintiffs was located several miles downstream. There is no indication that any part of the discharge of the sewer, either as solids, liquids or gases, ever reached the plaintiffs' land prior to the year 1952 or that, since the construction of the new plant, it ever will again. A beneficent and forgiving Mother Nature, with her judicious use of the sun, the air and the water, by chemical change, the action of enzymes and oxidation, possibly aided by the appetites of the lowly crawfish and other creek scavengers and other agents concerning which this court does not profess knowledge, had intervened and once again had gradually undone the effect of man's spoilage and removed the evidence of his presence from the stream. We are of the opinion that in this case there was never any nuisance, either temporary or permanent, which affected plaintiffs' land prior to the year 1952, and we are further of the opinion that the effects from which it suffered in the years 1952 and 1953 constituted a temporary nuisance and interference with plaintiffs' right of enjoyment of their premises only after that time.[12] Such being the case, the plaintiffs' measure of damages was not the difference in value of the land, as contended by the appellant, the court did not err in admitting evidence in reference to the construction of the sewage treatment plant, or as to the inadequate treatment of sewage in the year 1952, or as to the effect of a properly constructed and operated sewage treatment plant, and we are further of the opinion that plaintiffs' cause of action was not barred by the five-year statute of limitations.

Appellant's final assignment is based upon the contention that respondent Leland Newman admitted he did not acquire title until August of 1952, after he knew that the pollution had occurred. We do not understand, from the interrogatories or the testimony, that this is the fact. Some deeds were placed in evidence wherein it appears that Leland acquired a portion of the farm in 1927 and some more land in 1935. It appears that in 1944, through the use of one Shindler as a conduit of title, he conveyed some land to his wife and his son, and in August of 1952 his son conveyed some land back to Leland. None of these exhibits are in the transcript and we can only guess as to what portion (or whether all or any) of these lands was conveyed out and back; but we are left with the impression that respondents have owned the beneficial interest in the land for many years. Be that as it may, they were living upon the land and farming it when the pollution first occurred. Even if they were there only as tenants at will, the acts of the defendant having constituted a temporary and not a permanent nuisance, as we have held, they had a cause of action for their personal loss and the injuries sustained because of defendant's interference with their business and the enjoyment of their then home.[13]

The judgment is affirmed.

McDOWELL, P. J., and STONE, J., concur.

12. See Fansler v. City of Sedalia, 189 Mo. App. 454, 176 S.W. 1102.

13. Some cases which bear on the development of the principal question, in chronological order, are:

Smith v. City of Sedalia, 1899, 152 Mo. 283, 53 S.W. 907, 911, 48 L.R.A. 711, concerned itself principally with whether a prescriptive right had been acquired. It was held that while it was manifest in 1887 that the natural result of the sewer then being constructed would be to cast sewage into a drain which would eventually bring it to the land owned by plaintiff, and the result had "to some degree" been accomplished, the injury could not then be determined. The court pointed out that at such time the sewage was being discharged at a much greater distance from plaintiff's land and was exposed to the action of the air before it entered plaintiff's land.

Smith v. City of Sedalia, 1902, 182 Mo. 1, 81 S.W. 165. The same case again upon appeal. The sewer outlet was some 5,000 feet from plaintiff's land and by the time it reached such land its offensive character was diminished. Then it was moved downstream to within 700 feet of plaintiff's land. The court held that plaintiff had a cause of action for the

destruction of its comfortable use and occupation if that be shown.

Kellogg v. City of Kirksville, 1910, 149 Mo.App. 1, 129 S.W. 57. The sewer was built in 1894 but not extended until 1902. Suit was commenced in 1905.

Smith v. City of Sedalia, 1912, 244 Mo. 107, 149 S.W. 597, 599, was a following suit while the action resulting in the two Smith cases above mentioned lay dormant. The question was whether the first suit was a bar to that later suit and that depended upon whether the injury in the first was permanent in character. The statement of facts showed the sewer outlet was extended to within 200 yards of plaintiff's land and by 1893 the sewer was, "so far as human wisdom could forecast, a permanent institution, subject only to an increase of use."

Luckey v. City of Brookfield, 1912, 167 Mo.App. 161, 151 S.W. 201. The sewer was built in 1899 without acquisition by condemnation. Suit was for damages occurring in 1910 and 1911. Held an easement which caused permanent nuisance had been appropriated, but said, 151 S. W. loc. cit. 202, "When the sewer was completed, the injurious effect it would have on the use of the land of plaintiff was apparent, and the loss that would be inflicted thereby could be ascertained and appraised with reasonable accuracy, and, doubtless, was reflected in an immediate depreciation of the market value of the land."

Fansler v. City of Sedalia, 1915, 189 Mo.App. 454, 176 S.W. 1102, 1103. The sewer outfall was located 250 yards above the farm which plaintiffs subsequently purchased. There was some pollution at that time, but it had not yet become substantial. The court held that though there had been created a technical cause of action there had not yet been an invasion of a substantial right, that while the construction of the sewer was permanent, the injury to the farm did not become complete until a nuisance was created thereon.

In City of Cape Girardeau v. Hunze, 1926, 314 Mo. 438, 284 S.W. 471, 481, 47 A.L.R. 25, which was a condemnation case, it was held that so long as the city did not make use of the stream so as to deprive the owners of their riparian rights, they had no claim for compensation or damages.

Kent v. City of Trenton, Mo.App.1931, 48 S.W.2d 571. The original sewer was built in 1914 and put into use. The pipe was carried across part of plaintiffs' land, terminated thereon and commenced discharge of sewage. Held that this was a permanent nuisance accomplished by actual entry, that it was obvious that damage would then result and would continue indefinitely.

Person v. City of Independence, Mo. App.1938, 114 S.W.2d 175, 179, involved primarily the statute of limitations. The city maintained a disposal plant since 1909. In 1925 plaintiff acquired property which was some 200 feet from the plant. Suit was brought for nuisance resulting in 1930. The court held that the erection of the sewer structure itself is not unlawful and that the cause of action does not arise when the result to some degree has been accomplished, but when the injury becomes apparent and the injury can be ascertained with reasonable accuracy.

Riggs v. City of Springfield, 1939, 344 Mo. 420, 126 S.W.2d 1144, 1152, 122 A.L.R. 1496. The plaintiffs' land was located about one mile southwest of Springfield. Stream had been used since 1893 for the dumping of sewage. A plant had been constructed in 1913 and improved at various times thereafter. It was held that the city appropriated the right to use the creek under its power of eminent domain, that the nuisance was permanent, but the court said that the testimony showed that raw sewage was seen in the creek from the beginning and during at least a part of that period the condition was bad as to the presence of sewage; pollution and smells were bad.

Stewart v. City of Springfield, 1942, 350 Mo. 234 (banc), 165 S.W.2d 626, 631. The city had appropriated the use of the creek and the injuries to plaintiffs' land had long been apparent. In fact, they had recovered damages therefor previously. It was held the nuisance was permanent. The court said, "The petition further shows on its face that *the injury to appellants' land* was apparent in 1906". (Emphasis ours.)