Aaron **LEWIS** (Plaintiff), Respondent,

v.

**CITY OF POTOSI**, a Municipal Corporation (Defendant), Appellant.

No. 29974.

St. Louis Court of Appeals. Missouri.

Nov. 5, 1958.

**624** ■ 

Dearing, Richeson & Weier, Samuel Richeson, Hillsboro, Larry J. Casey, Potosi, for appellant.

Roberts & Roberts, J. Richard Roberts, Farmington, for respondent.

ANDERSON, Judge.

Plaintiff, Aaron Lewis, is a riparian owner of land on Mine Au Breton Creek near Potosi, in Washington County, Mis-

souri, and brought this suit against the City of Potosi. The petition in said suit was in three counts. In count one plaintiff sued for damage to his land and for loss of livestock caused by defendant city emptying sewage and effluent from its disposal plant into said creek, thereby polluting the water thereof, causing offensive odors and rendering the water unfit for use, with the result that he suffered damage by reason of the depreciation of his land in the sum of $7,500, and loss in the sum of $3,750 for the value of his livestock poisoned by drinking said water. Count two was based on defendant's alleged negligence in the operation of its sewage disposal plant, and sought recovery for damage to plaintiff's land and for the loss of his cattle in the same amounts as prayed in count one. Count three sounded in equity and sought an injunction. There was a verdict and judgment for plaintiff on count one in the sum of $2,000. Count two was dismissed by plaintiff at the close of plaintiff's case. The court found in favor of defendant on count three. Defendant has appealed from the adverse judgment on count one.

Plaintiff's farm consisted of 48 acres and was located about a mile and a half downstream from the city limits. Potosi is a municipal corporation of the fourth class. Said city at all times herein mentioned has maintained within the city limits on Mine Au Breton Creek a septic tank or sewage disposal plant which was put into operation in 1937. The dimensions of the tank were 96 x 20 feet, and 8 feet high, and until 1943 the contents were discharged into the creek 600 feet below the tank. In September, 1943, a pipe was run 2,500 feet from the outlet of the septic tank down to a pond or lagoon which had been built by defendant city. This pond or lagoon was about 150 feet long and about 100 feet wide at one end, and 30 or 40 feet wide at the other end, and was made by constructing a dike across the bend in an old creekbed. Thereafter, everything that came out of the septic tank flowed down the pipe into this lagoon. This included solids which

would settle in the lagoon, where, through bacterial action, the noxious elements therein would be largely destroyed. The water from the lagoon would seep through the dike into an adjacent slough, and from there into Mine Au Breton Creek. The dike was built of dirt, gravel and rocks, and was porous enough for water to seep through. There was no overflow pipe in the lagoon. Occasionally there would be an overflow and when this would occur the dike would be built higher. The overflow would run into the creek. The dike was 4 feet high at the time it was constructed, and was thereafter built up to a height of about 10 feet. In the case of overflow, solids that would float would go over the top of the lagoon and into the creek. The water that seeped out from the lagoon and went into the creek was discolored.

Alex Cordia, who supervised the city water works, streets and sewers, testified there was some odor around the lagoon.

William J. LaChance, who worked on a farm adjacent to the Lewis place, testified that during the last three or four years the water in the creek at the Lewis farm had an odor and "something in it that collects on the gravel and rock * * *. It is just something that will gather on the rocks like moss." LaChance stated that there was not much difference between the color of the water just below the lagoon and the color at the Lewis farm. On cross-examination the witness testified that the condition described had existed from the time the septic tank was installed.

Plaintiff testified that he first detected an odor from the creek at his farm either the last week in 1950 or the first week in 1951; that prior to that time the color of the water was, "I would say it looked like any other creek," but since that time "it is colored." Plaintiff stated that the water has the color of beer, "* * * kind of amber. The lower the creek gets the more colored it gets." Another place in his testimony plaintiff stated that since 1951 the condition of the water got worse, and testi-

fied: "it would come down there and would settle when the water was low and the bottom of the creek would get black.

"Q. What do you mean by black? Explain to the jury so they can understand what you mean. A. I mean the sewage was sticking to the bottom of the creek.

"Q. Did that ever happen prior to 1951? A. It was late '50 or early '51.

"Q. Before that did it happen? A. No."

Edward S. Richeson, a witness for the defendant, testified that prior to 1942, after the installation of the septic tank, he had occasion to observe the condition of the water in Mine Au Breton Creek, both at the point where the discharge from the septic tank entered the creek and at the Lewis farm, and, in fact, stated he had observed the creek below the septic tank for a distance of a mile or mile and a half below the Lewis place. At those times the water was a darkish color and had a horrible odor. The rocks and stones were covered with a black substance, and also gave out an odor. Richeson testified: "Q. During what years would you say that was? A. Mostly not later than the summer of '42, and as far back as, I would say, '37, '38, '39, in there, that period of years."

In 1952 plaintiff had 25 head of cattle on his place. Ten head of these cattle were kept in a pasture where they had access to the creek and used the creek for drinking purposes. Five of these cattle got sick and died. In describing the illness from which the cattle died, plaintiff testified: "Well, the first thing they went off feed. I don't mean they quit eating. I was feeding them some dry feed. In '52, the latter part of '52, was a dry year. I bought these calves for breeding purposes, for stock cows. That was why I was keeping them separated. So, I took these calves, I had them on barley pasture, separated from the other cattle. When the barley played out, which I say would be June,

then I went to letting them in this little pasture, the creek bottom, and across the creek. * * *

Q. * * * I asked you what they looked like. Were they gaunt or what was the situation? A. That was the first thing they would do. * * * Before they died they went to chewing their teeth, gritting their teeth.

"Q. Did they pass any blood? A. Yes, sir, that was the last thing. When they went to passing blood they died.

"Q. Mr. Lewis, had you pastured that same place previous to that with cattle? A. Yes, every year. I always did.

"Q. Did anything happen to the cattle before that? A. No, sir. I wouldn't say I never lost any. That wouldn't be saying it right.

"Q. Did you ever lose any cattle like that? A. No, sir."

Plaintiff stated that the reasonable value of these five head of cattle was $200 each.

Plaintiff further testified that the next year on one occasion a gate blew open and his cattle got into this pasture where they had access to this creek. Plaintiff got them out of this pasture immediately, but one of them subsequently died. The reasonable value of this calf was $150. Before this calf died it looked and acted the same as the five others that had died the year before.

In 1951 or 1952 plaintiff had 76 or 78 head of hogs that had access to the creek. These hogs got sick and 19 or 29 of them died. The ones that were lost were worth $45 a head. Plaintiff sold about 35 of the remaining hogs for about a third of their value. Again, in 1956, three of plaintiff's hogs that had access to the creek became sick, but they got well.

Plaintiff gave the following testimony with reference to the damage to his farm:

"Q. Mr. Lewis, prior to this condition, which you say happened the latter part of '50 or '51 to the creek, before, in '50, when you say the creek was like a normal creek, normally clear, water like in a normal creek, what was the reasonable market value of your farm? A. Well, I would say $35,000.

"Q. After this happened, you found this condition, the creek had such an odor and your hogs died and you don't use the water, what is the reasonable value of your farm? A. That is pretty hard to determine. I would sell it for $20,000."

In July, 1955, samples of water taken from the creek were analyzed by Dr. George Walters of St. Louis. The examination was made under the supervision of Dr. John Eibert, a chemical engineer. The purpose of the examination was to determine the bacterial count in the water and the presence therein of coliform organisms. One sample was taken near where the water flowed from the lagoon, and the other was taken from the creek at the Lewis farm. In the first sample there was a bacterial count of 150,000 per milliliter, and in the second sample a bacterial count of 15,000 per milliliter. Both samples were heavily contaminated with coliform fecal pollution. Dr. Eibert testified that fecal pollution could have adverse effect upon the digestive tracts of animals. On cross-examination the doctor testified he did not know what effect the drinking of water containing a bacterial count of 150,000 would have on an animal. However, on redirect examination Dr. Eibert testified that he would not recommend for animal consumption water containing coliform organisms and a bacterial count as high as that shown in the two samples which he had tested. There was evidence on behalf of defendant that the presence of coliform organisms in the drinking water of animals would not have an adverse effect on such animals.

Defendant's witness Dr. W. R. Sheets, a veterinarian, testified on direct examina-tion that during 1952 he examined and treated some cattle belonging to the plaintiff. Some of the cattle were suffering from coccidiosis and mycotic stomatitis. The latter disease, according to the doctor's testimony, was an infection of the mouth caused by moldy growth on vegetation. Dr. Sheets also stated that coccidiosis could not be caused by coliform organisms in drinking water; and stated he found nothing to indicate that the illness and death of plaintiff's cattle were in any way connected with the water in Mine Au Breton Creek. The doctor also testified he had examined plaintiff's hogs and found them suffering from cholera, and that hog cholera could not be caused by coliform organisms. On cross-examination Dr. Sheets testified he believed he called at plaintiff's farm in reference to the hogs in 1951; and further testified he was not positive that he examined cattle for Mr. Lewis in 1952. Dr. Sheets stated:

"Q. He brought some cattle over to your place one time for examination. Wasn't that in 1954? A. That is about right.

"Q. 1954 was when you found this stuff at their mouth? A. Yes, sir."

On redirect examination the doctor testified:

"Q. Dr. Sheets, did you also go to Mr. Lewis' farm and look at some sick cattle? A. Yes, sir.

"Q. What year was that? A. I am not positive * * * I saw some sick cattle at his farm. * * *

"Q. It was after the sick hogs in '51 that you saw the sick cattle at his farm? A. Yes, sir.

"Q. That was where you diagnosed this coccidiosis? A. Yes, sir."

The Official Manual for the State of Missouri shows that in 1940 the population of the City of Potosi was 2,017, and 2,359 in the year 1950. Plaintiff's original peti-

tion was filed in the Circuit Court of Washington County on June 24, 1955.

 Appellant's first point is that the trial court erred in overruling defendant's motion for a directed verdict, for the reason that the action is barred by the five year statute of limitations, section 516.120 RSMo 1949, V.A.M.S. It is appellant's theory that the cause of action accrued at the time the sewage plant was established in 1937. Respondent contends the cause of action did not accrue until December, 1950, when the injury, according to the evidence, first became apparent.

Respondent is correct in his contention that, under the decisions, the statute of limitations does not begin until the damage becomes apparent. Newman v. City of El Dorado Springs, Mo.App., 292 S.W.2d 314; Person v. City of Independence, Mo.App., 114 S.W.2d 175. The question then is, When did the damage to plaintiff's land become apparent? The evidence on this point is conflicting.

Plaintiff's witness, William J. LaChance, testified that he had been familiar with the creek and sewage plant for many years, and that the water in the creek at the Lewis farm had an odor which had existed from the time the septic tank was installed.

Dr. G. F. Cresswell, defendant's witness, testified that prior to the extension of the discharge line he had occasion to observe the water in Mine Au Breton Creek downstream below the Lewis farm in the summertime when the water was low. On a gravel bar in said stream he observed scum, dirt and filth. However, Dr. Cresswell stated he would not say these substances were from sewage.

Edward S. Richeson, defendant's witness, testified that the creek was polluted both above and below the Lewis farm as far back as 1937.

A. A. Casey, defendant's witness, testified that as far back as 1937 one could see scum on the water near the Breton Creek

school house, which was about a quarter of a mile below the Lewis farm.

However, plaintiff testified that he first detected an odor from the creek at his farm either the last week in 1950 or the first week in 1951; that prior to that time the water looked like the water in any other creek, but after that time the water had an amber color and, when the water was low, the bottom of the creek would get black, with sewage sticking to the bottom of the creek.

Plaintiff is not bound by the testimony of his witness LaChance, but is entitled to a consideration of the evidence taken in its most favorable aspect to his case. Plaintiff's testimony clearly indicates that the injury to his property first became noticeable the last week in December of 1950, or the first week in 1951. This suit was filed June 24, 1955, less than five years from the date of injury. The court did not err in overruling defendant's motion for a directed verdict.

 Appellant next complains of Instruction No. 1, given by the court at the request of plaintiff. It was a verdict-directing instruction and authorized a verdict if the jury found, among other facts, that the creek adjacent to plaintiff's premises "prior to 1950 carried clear, pure and wholesome water, suitable and valuable for the use of livestock along, upon, adjacent to and over plaintiff's premises, and if you further find and believe from the evidence that from 1950 and thereafter that the raw sewage or effluent from the disposal plant and settling ponds of the City of Potosi were and are offensive, contaminated and polluted in excess of what it was prior thereto, and that the stream mentioned in evidence adjacent to, running along, over and through plaintiff's premises has become offensive, contaminated and polluted in excess of what it was prior thereto, and that said stream has been made ugly and unsightly; useless for domestic and livestock purposes; and that said stream has caused the premises of plaintiff to give off obnox-

ious and vile odors, and if you further find that plaintiff's livestock have become sick and some have died as a direct and proximate result of the water in the stream mentioned in evidence flowing through, over, along and adjacent to plaintiff's premises, becoming polluted and contaminated and that said water was polluted and contaminated by the City of Potosi, if you so find, then your verdict will be in favor of the plaintiff, Aaron Lewis, and against the City of Potosi, and in such sum as you may think he has been reasonably damaged, and not exceeding, however, the sum of $11,250."

Authorizing a verdict upon a finding that the creek became polluted at any time during 1950 was error. The suit was not filed until June 24, 1955. Approval of the instruction would have the effect of extending the statute of limitations to five years, five months and twenty-four days. To be proper, the instruction should have been based on plaintiff's evidence that the stream became polluted at his farm either in December, 1950, or January, 1951.

There is another error in the instruction, which, although not made the basis of an assignment of error, is so vital that we believe it should be called to the attention of the parties.

■ An action by a landowner against a municipality for the maintenance of a permanent nuisance of the character here involved, which adversely affects the value of the plaintiff's land, is by the demand for permanent damage converted into an action in the nature of a condemnation proceeding. The pollution of the stream is equivalent to a taking or an appropriation of the plaintiff's property in part, and the law permits the acquisition of the easement in such cases by the payment of permanent damages, the judgment having that effect. The right to damages is not affected by the fact that the acts complained of were done in the exercise of a governmental function, the position being that the damage arising from the impaired value of the property is to be considered as a "taking or appropriation," and brings the landowner's claim within the well settled constitutional provision that private property may not be taken, even for a public benefit, without just compensation. In such a case, on account of its nature, the damages are confined to the diminished value of the land incident to the maintenance of the permanent nuisance, which is in the nature of an easement. 39 Am.Jur., Nuisance, § 136, page 398; Moser v. City of Burlington, 162 N.C. 141, 78 S.E. 74; Hines v. City of Rocky Mount, 162 N.C. 409, 78 S.E. 510, L.R.A.1915C, 751; Williams v. Town of Greenville, 130 N.C. 93, 40 S.E. 977, 57 L.R.A. 207; Newman v. City of El Dorado Springs, Mo.App., 292 S.W.2d 314. In the latter case, the court said (loc. cit. 318):

"The Missouri courts have heretofore held that a nuisance which results and follows from the turning of sewage into a water course is permanent, and the law of eminent domain applies instead of the law of nuisance. *Hence, the landowner's one and only right of action accrued at a time when the injury became apparent, and the measure of damages was the difference in the market value of the land before and after.*" (Emphasis ours.)

■ Instruction No. 1 permits the jury to consider as elements of plaintiff's damage the value of the cattle and hogs that died as a result of drinking the polluted water. Such items of damage are not recoverable in an action such as the one in the case at bar, which is to be considered as an action in the nature of a condemnation proceeding. Instruction No. 4 is bad for the same reason. However, the evidence relative to the illness and death of plaintiff's livestock was properly admitted; it was relevant on the issue of the existence and character of the wrong; also, it was relevant on the issue of the diminished value of the real estate. But, plaintiff's loss by reason of the death of his livestock was not recoverable as a separate, independent item of damage. Pinney v. Berry, 61

Mo. 359; Moser v. City of Burlington, 162 N.C. 141, 78 S.E. 74; City of Wichita Falls v. Sullivan, Tex.Civ.App., 22 S.W.2d 982, affirmed Tex.Com.App., 39 S.W.2d 882; City of Hazard v. Eversole, 280 Ky. 621, 133 S.W.2d 906; Kentucky-Ohio Gas Co. v. Bowling, 264 Ky. 470, 95 S.W.2d 1; Gay v. Perry, 205 Ky. 38, 265 S.W. 437.

The judgment must be reversed and the cause remanded for the error in Instruction No. 1 complained of by appellant. There are other errors alleged which we will not notice for the reason that they are not likely to recur at a retrial of the case. The judgment is reversed and the cause remanded for new trial.

RUDDY, P. J., and WOLFE, J., concur.