TOWN OF SOMERSET *vs.* DIGHTON WATER DISTRICT
(and a companion case between the same parties).

Bristol. May 8, 1964. — June 30, 1964.

Present: WILKINS, C.J., WHITTEMORE, CUTTER, KIRK, & SPIEGEL, JJ.

*Water. Municipal Corporations,* Waterworks. *Eminent Domain,* Validity of taking, Property in public use. *Dighton Water District. Words,* "Appropriated and used," "And."

Property already devoted to a public use cannot be diverted to another, inconsistent use without plain legislative authority. [742]

In the provision of St. 1950, c. 359, § 2, authorizing the Dighton Water District to acquire waters "not already appropriated and used for the purposes of a public water supply," the word "and" should be read to mean "or." [742–743]

Utilization of the watershed of a river in Dighton by another town for its public water supply by means of a well field located in the watershed was a use of the waters of the river precluding the Dighton Water District from subsequently taking the waters of the river under St. 1950, c. 359, § 2, authorizing the district to take the waters of any stream in Dighton "not already . . . used for the purposes of a public water supply." [743]

Two BILLS IN EQUITY filed in the Superior Court on February 8, 1962, and June 22, 1962, respectively.

Following a master's report in one of the suits, final decrees were entered by *Dewing, J.*

*Douglas Smerdon* for the defendant.

*James W. Killoran* (*Ephraim F. Horvitz* with him) for
the plaintiff.

SPIEGEL, J.   The plaintiff, the town of Somerset, in one
suit against the Dighton Water District seeks a declaration
under G. L. c. 231A that the town has an exclusive right to
use the waters and watershed of the Segreganset River for
its public water supply system and that an alleged taking of
the waters of the Segreganset be declared null and void.
In another suit the plaintiff asked that the defendant be
restrained from "any further action in execution" of the
alleged taking.[1]   The cases were referred to a master.   The
defendant appeals from interlocutory decrees which denied
the defendant's motion to recommit, overruled exceptions
to the master's report, and confirmed the report, and from
a final decree substantially granting the declaratory relief
requested by the plaintiff.

We summarize the master's report.   The Segreganset
River flows through Dighton, where it empties into the
Taunton River.   Since 1927 the plaintiff, located south of
Dighton on the westerly bank of the Taunton, has utilized
the Segreganset watershed for its public water supply.   In
1926 and 1927 the plaintiff acquired by purchase and by
eminent domain 200 acres of land along the banks of the
Segreganset in Dighton.   In 1927 the plaintiff "constructed
a water system piping water from a well field in Dighton
located in the watershed of the Segreganset."   This sys-
tem soon proved inadequate.   In 1945 "[the plaintiff's]
demand for water had equalled its maximum supply."[2]
Since 1951 the plaintiff has been compelled to supplement
its water sources by purchasing water from nearby com-
munities.   Except on a few occasions when the plaintiff

---

[1] The defendant appealed from a final decree dismissing the bill in that suit,
but none of the arguments made by either party is pertinent thereto.   The
dismissal was with the plaintiff's consent.   The defendant lacks standing to
appeal from this decree.   *Brown* v. *Brown,* 209 Mass. 388, 394.   Unless other-
wise noted, all further references in this opinion will be to the suit for de-
claratory relief.

[2] In 1945, approximately 87% of the plaintiff's water was derived from the
well field in Dighton.

caused the Dighton well field to be flooded in times of drought, the plaintiff "has never used the surface waters as such of the Segreganset or any of its tributaries."

The plaintiff "has acute need for additional water supplies." In 1961, at a special meeting, it voted to initiate several steps toward enlarging its water supply by diverting the waters of the Segreganset to an off-stream reservoir. These steps include the undertaking of an engineering survey, the selection and surveying of land for a reservoir site, the appropriation of money for purposes of acquiring land and constructing an enlarged system, and the authorization of the plaintiff's treasurer to issue bonds in order to raise additional money for these purposes. However, "[n]o formal order of taking of the reservoir land has been made or recorded nor has any purchase thereof been made."

Also in 1961 the plaintiff authorized its selectmen and water commissioners to purchase land belonging to the Montaup Electric Company (Montaup). Pursuant to this authorization, the plaintiff entered into an agreement with Montaup "to purchase some sixty acres of land in Dighton at the lowest riparian locus to the Segreganset River." Under the agreement Montaup retained several interests in the property to be conveyed; the deed was executed on September 23, 1962, "in conformance with the earlier agreement."

The defendant was established in 1950 by an act of the General Court, St. 1950, c. 359. In February, 1961, pursuant to a vote at its annual meeting, the defendant hired an engineering company "to explore for additional ground water supplies in . . . Dighton." A well site was found which was "capable of yielding safely a little over 200,000 gallons per day"; the defendant had "hoped to find a well site yielding almost twice that amount." In the fall of 1961, aware of the plaintiff's intention to build the reservoir, the defendant hired another engineering company which prepared a plan utilizing "the surface waters of the Segreganset for Dighton's water supply." Schematic

drawings of the plan were given qualified approval by the Massachusetts Department of Health on August 29, 1962.

On August 30, 1962, the defendant's commissioners held what they declared to be an "emergency meeting," though "no actual emergency existed; . . . one purpose for the promptness . . . was to adopt and record an order taking the waters of the Segreganset, before . . . [the plaintiff] could obtain and record a deed from Montaup . . . and before a restraining order freezing the status quo could be obtained." At the meeting the defendant's commissioners signed an "order of taking," pursuant to which the defendant purported to appropriate "all of the waters of the Segreganset River and its tributaries within the [t]own of Dighton not already . . . being appropriated and used for the purposes of a public water supply." On August 31, 1962, the "order of taking" was recorded in Bristol County Northern District registry of deeds.

The defendant states in its brief: "It is freely conceded that the [t]own of Somerset has been using considerable amounts of water derived from the watershed of the Segreganset River, by drilling wells and pumping the water out of the ground." Unquestionably any use of the Segreganset by the town for a water system is a public use. *Lynch* v. *Forbes,* 161 Mass. 302, 308. *Rockport* v. *Webster,* 174 Mass. 385, 391.

By St. 1950, c. 359, § 2, the defendant was authorized to "take by eminent domain . . . or acquire by lease, purchase or otherwise, and hold, the waters, or any portion thereof, of any . . . stream . . . within the town of Dighton *not already appropriated and used for the purposes of a public water supply*" (emphasis supplied). The issue before us is whether pursuant to this legislation the defendant was authorized on August 30, 1962, to take the waters of the Segreganset River.

We reject the defendant's contention to the effect that it has a right under St. 1950, c. 359, § 2, to appropriate the waters of the Segreganset "unless it has been *in specie* appropriated *and* physically used for the purpose of a public water supply" (emphasis partially supplied). It is

doubtful that the word "appropriated," as used in the statute, refers only to property to which title has formally been taken. It may well refer to property which another party has been given legislative authority to acquire and hold. See *McCombs* v. *Dallas County*, 136 S. W. 2d 975, 981 (Tex. Civ. App.); *McSorley* v. *Hill*, 2 Wash. 638, 649–650. It may also refer to property which is used by a body politic even though not formally taken. See *El Paso County Water Improvement Dist. No. 1* v. *El Paso*, 133 F. Supp. 894, 910 (W. D. Texas); *Modesto Properties Co.* v. *State Water Rights Bd.* 179 Cal. App. 2d 856, 860; *Lewis* v. *Potosi*, 317 S. W. 2d 623, 629 (Mo. App.). If the word "appropriated," as used in St. 1950, c. 359, § 2, means "permitted by legislative authority to be taken in eminent domain or otherwise acquired," it is clear that the waters of the Segreganset have been appropriated to the use of the plaintiff since 1926 and thus could not be taken by the defendant. See St. 1926, c. 339, § 2, authorizing the plaintiff to "take by eminent domain . . . or acquire by purchase or otherwise, and hold . . . the waters of [the] Segreganset river." If "appropriated" in St. 1950, c. 359, § 2, means no more than "used," we are of opinion that the master's finding of use by the plaintiff, *supra*, is sufficient to nullify any right which the defendant may otherwise have had to take the waters of the Segreganset.

It is well established in this Commonwealth that where property is devoted to a public use, it "cannot be diverted to another inconsistent public use without plain legislation to that end." *Byfield* v. *Newton*, 247 Mass. 46, 57. *Higginson* v. *Treasurer & Sch. House Commrs. of Boston*, 212 Mass. 583, 591. *Commonwealth* v. *Massachusetts Turnpike Authy.* 346 Mass. 250, 254. This is a salutary rule which fairly protects the interests of public bodies which may have expended resources for the improvement of property in reliance on a continued right to use that property. It promotes fiscal and social stability. We interpret St. 1950, c. 359, § 2, in the light of this rule. So interpreted, the language of the statute should be read to mean "appropriated *or* used for the purposes of a public water supply." There

is ample precedent for construing the word "and" disjunctively in order to further a recognized legislative purpose. *Commonwealth* v. *Griffin,* 105 Mass. 185, 186–187. *Friedman* v. *County of Hampden,* 204 Mass. 494, 505. *United States* v. *Fisk,* 3 Wall. 445, 447. *Collins Granite Co.* v. *Devereux,* 72 Maine, 422, 425. *People ex rel. Municipal Gas Co. of Albany* v. *Rice,* 138 N. Y. 151, 156.

On the basis of the foregoing interpretation of St. 1950, c. 359, § 2, it is clear that regardless of the meaning assigned to the word "appropriated," if the plaintiff has "used" the waters of the Segreganset River for its public water supply, the defendant's purported taking on August 30, 1962, is null and void. The defendant argues at length that the plaintiff's use of the watershed and occasional use of the surface waters do not permit the conclusion that the waters of the Segreganset were "used for . . . a public water supply" within the meaning of St. 1950, c. 359, § 2. In its brief the defendant cites no cases or authorities in support of this argument. We are unable to accept the defendant's reasoning. "A brook or river, so far as concerns surface indications, is inseparably connected with its watershed and owes the volume of current to its area." *Stratton* v. *Mount Hermon Boys' Sch.* 216 Mass. 83, 86. The final decree correctly stated "[t]hat [the plaintiff] in the development and operation of its public water supply system has used the waters of the Segreganset River and its watershed."

In their briefs the parties present arguments pertaining to several other matters, including the nature of the plaintiff's rights as the lowest riparian holder, but our interpretation of St. 1950, c. 359, § 2, obviates the need to discuss these issues. We perceive no point in enumerating the exceptions to the master's report. Those which merit discussion have been dealt with in this opinion. In the suit to restrain the defendant from further action in execution of the taking, the defendant's appeal is dismissed. In the suit for declaratory relief the interlocutory and final decrees are affirmed.

*So ordered.*