The CITY OF BLUE SPRINGS,
Missouri, Respondent,

v.

CENTRAL DEVELOPMENT ASSOCI-
ATION, and Community Water
Company, Inc., Appellants.

No. WD 44057.

Missouri Court of Appeals,
Western District.

April 14, 1992.

Motion for Rehearing and/or Transfer to
Supreme Court Denied
June 2, 1992.

Application to Transfer Denied
July 21, 1992.

Thomas J. Daly, Kansas City, for Community Water. Thomas H. Bennett, Independence, Mick Lerner, Stephen Owens, Dick Woods, Kansas City, for Cent. Development.

Paul E. Vardeman, Cathy J. Dean, Kansas City, for City of Blue Springs.

Before FENNER, P.J., and ULRICH and SPINDEN, JJ.

SPINDEN, Judge.

Central Development Association (CDA) and Community Water Company (CWC) appeal a jury's verdict of $100,000 against the City of Blue Springs for the city's taking of property by condemnation. CDA and CWC contend that the trial court erred in excluding their evidence relating to separate values for the surface land and the water beneath it. We affirm the trial court's judgment.

Blue Springs is a fourth class municipal corporation. Until 1990, it purchased water for its citizens from the Missouri Water Company. In 1979 Missouri Water announced that when the existing contract expired in 1990 it would cease supplying water to Blue Springs. Blue Springs seeks a new water source by this condemnation action.

CDA is a Missouri corporation, wholly owned by the Reorganized Church of Jesus Christ of Latter Day Saints. CDA holds title to property for the church, including approximately 6,000 acres of farmland in the Atherton Bottoms area northeast of Independence. Beneath CDA's farmland is an extensive water supply consisting of a deposit of alluvial rocks, gravel and sand, which filters and retains ground water.

After Blue Springs announced its intention to condemn CDA's land in the Atherton Bottoms in 1981, CDA conveyed rights to part of the water under the west 4000 acres by a subsurface water deed to CWC, incorporated in May 1982 as a water company. CDA owns 94 percent of CWC's stock. CDA was to receive one-half of CWC's proceeds from water sales, and CDA reserved the right to use all of the water it needed for farming the land. CWC did not own any wells, pipes, or a water treatment plant.

As CDA expected, Blue Springs did seek to condemn CDA's land on August 6, 1982, but the city wanted only 49.83 acres of CDA's land. The city wanted 34.12 acres for a water treatment plant and transmission lines and 15.71 acres for water wells.

CDA and CWC filed a joint motion to dismiss the condemnation petition. After hearing evidence for three days, the trial court dismissed Blue Springs' condemnation petition, and the city appealed. This court reversed the dismissal in *City of Blue Springs, Missouri v. Central Development Association*, 684 S.W.2d 44 (Mo. App.1984).

On remand, after Blue Springs filed an amended petition, the trial court ordered condemnation and appointed commissioners. The commissioners awarded CDA and CWC $98,850. CDA, CWC and Blue

Springs filed exceptions to the commissioners'.report.

Two weeks before the jury trial on the exceptions, Blue Springs filed a motion to dismiss CWC's exceptions. The motion also asked the court to forbid CWC's or CDA's presenting evidence concerning the value of CWC's interest in the property, the water's separate value, and any land valuation based on the income method. The trial court overruled the motion to dismiss CWC's exceptions and made these rulings:

1. Any evidence of or discussion of the separate value of the water is excluded. Counsel are directed not to discuss in any way a separate value for the water in the presence of the venire or the jury;

2. The Jury will not be permitted to consider evidence based on the income approach in its determination of the value of the partial taking of this unimproved property;

3. The testimony of William Davis, Jr., is excluded;[1]

4. Any evidence or testimony that relies on the conclusions of William Davis, Jr., is excluded;

5. Both Community Water Company and the Central Development Association may participate in the trial of the exceptions; and

6. Any evidence of the conveyance of water rights is excluded.

Blue Springs later asked the court to exclude CWC's expert witness, Keith Wilson, Jr., because CWC had not identified him as an expert witness until seven days before trial. At trial, Blue Springs also objected that Wilson's testimony would be based on giving the water a separate value and was, therefore, improper. The trial court excluded his testimony.

The court convened a jury trial on August 6–10, 1990. The jury awarded CDA and CWC $100,000, and on August 28, 1990, the trial court entered judgment consistent with the verdict.

In this appeal, CDA and CWC contend that because CDA conveyed its water rights to CWC, the trial court should have permitted it to present evidence valuing the land and water separately—that judgment should have been entered for the land's value in favor of CDA and for the water rights in favor of CWC. We disagree.

■ In a condemnation proceeding, the measure of damages is the difference between fair market value of the property before the taking and the fair market value after the taking. Any factor affecting market value is a proper element of damages. *State ex rel. Missouri Highway and Transportation Commission v. Horine*, 776 S.W.2d 6, 12 (Mo. banc 1989). Value of the water certainly was a factor for consideration in this case, but we disagree with CDA's and CWC's contention that the water value should have been separated from the overall land value.

■ CDA and CWC acknowledge the general rule that mineral deposits are not to be valued separately and are considered only to the extent which they enhance the land's value, but they assert that their case falls within a recognized exception: The values are to be separately stated if the surface and mineral rights have been severed into separate estates. *State ex rel. State Highway Comm'n of Missouri v. Foeller*, 396 S.W.2d 714, 719 (Mo.1965); *A.P. Green Refractories Co. v. Duncan*, 659 S.W.2d 19, 21 (Mo.App.1983). We conclude, however, that the water at issue in this case should be distinguished from mineral deposits generally and that neither the rule nor the exception apply.

In *Higday v. Nickolaus*, 469 S.W.2d 859, 865 (Mo.App.1971), this court recognized two categories of subterranean waters—underground streams and percolating waters:

An underground stream is defined as water that passes through or under the surface in a definite channel or one that is reasonably ascertainable. Percolating

1. Davis was CWC's expert who was prepared to offer an opinion as to what the separate value of CWC's water right was.

waters include all waters which pass through the ground beneath the surface of the earth without a definite channel and not shown to be supplied by a definite flowing stream. They are waters which ooze, seep, filter and otherwise circulate through the interstices of the subsurface strata without definable channel, or in a course that is not discoverable from surface indications without excavation for that purpose[.]

█ Underground waters are presumed to be percolating, and if a party claims that a subterranean stream exists, he bears the burden of proof. *Id.* CDA and CWC do not contend that the water at issue is not percolating.

Under the English common law,[2] percolating waters were a part of the land in which they were found and belonged absolutely to the land's owner. A landowner could withdraw any amount of water without liability, no matter what effect his use had on adjoining landowners and the water under their lands. *Id.* Because of dissatisfaction with this rule, many courts, including Missouri, began applying the "reasonable use" rule:

> Generally, the rule of reasonable use is an expression of the maxim that one must so use his own property as not to injure another—that each landowner is restricted to a reasonable exercise of his own rights and a reasonable use of his own property, in view of the similar rights of others.... As it applies to percolating ground water, the rule of reasonable use recognizes that the overlying owner has a proprietary interest in the water under his lands, but his incidents of ownership are restricted. It recognizes that the nature of the property right is usufructuary rather than absolute as under the English rule.

*Id.* at 866 (citations omitted). Under the reasonable use rule, a landowner may use the underlying ground water freely for any purpose incidental to his beneficial enjoyment of the land. He does not, however,

own the water. Because of the wandering and migratory nature of percolating water, a landowner does not own it in the absolute sense.

This court finds persuasive the analysis of the Florida Supreme Court, in *Village of Tequesta v. Jupiter Inlet Corp.*, 371 So.2d 663 (1979), in which the court considered whether a landowner had sufficient interest in percolating water to require condemnation. The court held:

> [T]he term "ownership" as applied to percolating water never meant that the overlying owner had a property or proprietary interest in the corpus of the water itself.
>
> This necessarily follows from the physical characteristic of percolating water. It is migratory in nature and is a part of the land only so long as it is in it. There is a right of use as it passes, but there is no ownership in the absolute sense. It belongs to the overlying owner in a limited sense, that is, he has the unqualified right to capture and control it in a reasonable way with an immunity from liability to his neighbors for doing so. When it is reduced to his possession and control, it ceases to be percolating water and becomes his personal property. But if it flows or percolates from his land, he loses all right and interest in it the instant it passes beyond the boundaries of his property, and when it enters the land of his neighbor it belongs to him in the same limited way.
>
> The right of the owner to ground water underlying his land is to the usufruct of the water and not to the water itself. The ownership of the land does not carry with it any ownership of vested rights to underlying ground water not actually diverted and applied to beneficial use.

*Id.* at 667. The court concluded that the user's right to the water was not a private property right requiring condemnation pro-

---

**2.** Actually, the principle of law was first announced in *Greenleaf v. Francis*, 35 Mass. (18 Prck) 177 (1836), but credit for establishment of the doctrine typically is given to *Acton v. Blundell*, 12 Mees & W. 324, 152 Eng.Rep. 1223 (Exch.1843), 15 Mor.Min.Rep. 168.

ceedings unless the right was rendered useless for certain purposes.

■ We conclude that water is not severable from the land through or under which it flows. A landowner may convey his right to use the water, but not the water itself. That distinction alone makes water different from cases dealing generally with minerals and their severance. A further distinction is that mineral deposits typically are finite; once the mineral is removed no new deposits form. Water, on the other hand, is replenished.

■ The underground water at issue here constantly recharges. Blue Springs proposes to withdraw 10 million gallons a day, and acknowledges that its withdrawals could increase to 20 million gallons a day. CDA's and CWC's expert conceded that pumping out 10 million to 20 million gallons a day would not deplete the water supply—not even pumping out 100 million gallons a day would deplete it.

Blue Springs acquired almost 50 acres of the approximately 6000 acre tract, leaving CDA with about 5950 acres and the water underlying it for its and CWC's use. Under the rule of reasonable use, "an overlying owner, including a municipality, may not withdraw percolating water and transport it for sale or other use away from the land from which it was taken if the result is to impair the supply of an adjoining landowner to his injury." *Higday*, 469 S.W.2d at 866. Blue Springs may withdraw groundwater for the benefit of its citizens so long as the withdrawals do not interfere unduly with CDA's and CWC's beneficial use of water under CDA's land. *Id.* at 870.

We conclude that the trial court properly excluded evidence regarding the separate value of the water. CDA's and CWC's points concerning the issue are denied.

■ CDA and CWC argue that regardless of the severance issue, evidence regarding the separate value of the water

should not have been excluded because the court should have valued the property under the "separate valuation rule" or the "primary purpose rule." We disagree.

The general rule [3] in Missouri is:

[W]here there are different interests or estates in the property taken by condemnation, the proper procedure is "to ascertain the entire compensation as though the property belonged to one person and then apportion this sum among the different parties according to their respective rights."

*State ex rel. State Highway Commission v. Willis*, 483 S.W.2d 599, 603 (Mo.App. 1972) (quoting *State ex rel. McCaskill v. Hall*, 28 S.W.2d 80 (Mo. banc 1930), and *City of St. Louis v. Wabash R. Co.*, 421 S.W.2d 302, 304–05 (Mo. banc 1967)).

CDA and CWC contend, however, that their case falls within an exception to the general rule: [4]

There may be instances in which, owing to exceptional circumstances, the damages to the various interests when added together exceed the value of the property as a whole; in such case the particular interests should of course be separately appraised, because the owner of each is entitled to be compensated in damages for the amount[.]

*McCaskill*, 28 S.W.2d at 82; *City of St. Louis*, 421 S.W.2d at 305. We disagree that this exception applies.

■ Blue Springs will not take all of the water. Its withdrawals of 10 million to 20 million gallons a day will not interfere with CDA's and CWC's beneficial enjoyment of the land and water.

■ CDA and CWC further complain that Blue Springs' pumping will diminish the water's quality to the point of destroying any hope by CWC or a potential future buyer from operating a water company at the tract. At the time of trial CWC had no wells, pipes, distribution lines or a treatment plant. It had no potential customers. It was by no means an established business

---

**3.** This rule is generally called the "undivided fee rule" or the "unitary rule." *See* 4 Nichols, *Law of Eminent Domain* § 12.05[1] (1990).

**4.** This exception is often called the "separate valuation rule." *See* 4 Nichols, *Law of Eminent Domain* § 12.05[2].

enterprise. As the Missouri Supreme Court explained:

> Damages which are sought on the theory of injury to the remainder of land after the taking of a part must be direct and certain at the time of the appropriation and, conversely, not remote and speculative; and loss of profits is usually regarded as too speculative and remote to be considered as a basis for ascertaining the damages in a condemnation proceeding.... "In determining the uses of which the property is capable, it is necessary to have regard to the existing business or wants of the community or such as may reasonably be expected in the immediate future. This does not mean that the estimate may be based on any future profits that may be derived from the property when improved for a particular use when the business wants of the community may make it profitable to use the land in that particular way, but it means only that the fact of the property's capability or adaptability to the use may be considered as an element of its present value."

*State ex rel. Kansas City Power & Light Co. v. Salmark Home Builders, Inc.,* 375 S.W.2d 92, 98–99 (Mo.1964) (quoting 29 C.J.S. *Eminent Domain* § 160). We conclude that evidence of damages to the water's quality and its effect on future water sales were too remote and speculative.

In the alternative, CDA and CWC argue that the trial court should have applied a second exception to the unitary rule of appraisal, the primary purpose rule. They assert that when a condemnation's primary purpose is to acquire an identifiable portion of the fee (e.g., subsurface mineral or water rights) the condemnee should be justly compensated for what he has lost. *See Greystone Heights Redevelopment Corp. v. Nicholas Inv. Co., Inc.,* 500 S.W.2d 292, 298 (Mo.App.1973). The *Greystone* court explained, however, that the primary purpose exception "is applicable only where the condemnor wants and takes the minerals alone, separate from the fee." Blue Springs is not taking only water; it is also taking the land. The exception does not apply.

Because neither of the exceptions apply, the trial court properly required that the property value be set pursuant to the unitary rule. CDA and CWC contend, however, that the trial court erred in its application of the unitary rule. They argue that the trial court wrongfully excluded testimony by David Craig, William Davis, Jr., and Keith Wilson because those witnesses were properly applying the unitary rule. We disagree.

The jury heard extensive evidence about the water under the land. The only evidence excluded from the jury's consideration was the water's commercial value.

■ Craig would have testified that the highest and best use of the entire 6000–acre tract would change because of Blue Springs' pumping out large quantities of water. He believed that any future buyer of the remaining 5950 acres would probably pay less for the land out of concern that Blue Springs' pumping would diminish the water's quality. He opined that the difference in the before and after taking value of the land was $140 per acre, or a total difference of $809,060 for all 6000 acres.

The trial court properly excluded Craig's testimony because his opinion included improper factors. In explaining the basis for his opinion, Craig stated:

> The fact that a potential purchaser would know that this aquifer being with the property adds to the highest and best use of the property because it provides potential for a use for the property and, in my opinion, in the after condition knowing of those sales, knowing of what goes on with water for municipalities, he would reduce what he would pay for that property because that potential is less and the highest and best use is changed slightly by this acquisition.

These were improper factors because CWC was not actively engaged in the water sales business.

CDA and CWC rely on *City of St. Louis v. Paramount Shoe Manufacturing Co.,* 168 S.W.2d 149 (Mo.App.1943), as support

for admitting Craig's testimony. In that case, a partial taking prevented a business establishment from expanding, and the court held that evidence of that injury was properly admitted. The court, however, distinguished between evidence of harm to an established business and inadmissible evidence of alleged lost profits. In explaining the way damages are calculated in a partial taking, the court stated:

> [T]he damages sustained are to be regarded as a unit, although made up of integral parts—the value of the land taken, and the injury to the remainder; but before damages may be recovered upon the theory of injury to the remainder, they must be direct and certain at the time of the appropriation, since if they are but remote or speculative, they are too uncertain to be taken into account in estimating the depreciation in the value of the land.

*Id.* at 153. Craig could not provide an opinion based merely on the quantity and quality of the water without considering the prices that municipalities pay for water; therefore, the court properly excluded his testimony as too remote and uncertain.

CDA and CWC also complained about the trial court's excluding the testimony of William Davis, Jr. He would have testified that his appraisal assumed no severance and valued all interests applying the market data approach. He explained:

> [T]he appraiser finds sales of properties that he judges to be most similar to the property appraised, and on the basis of those wholesales makes adjustments from the sale to the subject property for an indication of the value of the property he's appraising.

Davis valued the property taken at approximately $2,000 an acre for a total of $99,660. After taking into consideration easements, he valued the property at $107,171.50. He also assessed severance damages of $350 per acre for 1448.06 acres [5] due to the loss of "domestic water potential," causing additional damage in the

amount of $506,821. He explained the severance damages:

> I'm talking about the fact that it just wouldn't be economically feasible for a competitor to locate a similar plant in the same area utilizing the same resources because it would have already been—this is certainly a water plant. It is one thing in the market that serves a market and it wouldn't be economically feasible for anybody else to do that thing.... There is no way anybody else could compete with them, with a municipality.

Davis admitted that he was valuing "the fact that there won't be anybody to sell water to."

The trial court properly excluded Davis' testimony. His opinion was based on the loss of domestic water potential and was an attempt by CDA and CWC to recoup the lost profits that they may experience due to the pumping of the water by Blue Springs. *Paramount,* 168 S.W.2d at 153; *Kansas City Power & Light Co.,* 375 S.W.2d at 99.

■ CDA and CWC also sought to elicit testimony from Keith Wilson, the former city manager of Independence. While he was city manager, Wilson handled Independence's purchase of the Missouri Water Company plant at Courtney Bend. He valued that property at $2 million and acknowledged that the presence of an aquifer contributed to the property's value. Blue Springs objected that this was an improper method of valuing the water and that CDA and CWC had failed to identify Wilson as an expert in pretrial discovery. The trial court sustained Blue Springs' objections and excluded all of Wilson's testimony.

We conclude that the trial court properly excluded Wilson's testimony. CDA and CWC did not establish that the sale of the Missouri Water Company property was comparable. In describing the Missouri Water sale, Wilson also attempted to separate the land's value from the value of water beneath it.

---

5. The 1448.06 acres is the land that Davis judged would be subject to draw down from Blue Springs' pumping.

CDA and CWC further contend that the trial court erroneously allowed Blue Springs to establish the value of land known as the Charity Tract during cross-examination of one of CDA's witnesses. CDA and CWC argue that the tract's value was irrelevant and prejudicial. To the contrary, as a part of the parent tract, evidence concerning its value was indeed relevant. The scope of cross-examination extends to any pertinent inquiry having a reasonable bearing on the issues. *Krez v. Mickel,* 431 S.W.2d 213, 215 (Mo.1968).

█ CDA's and CWC's final claim is that the trial court erred in admitting evidence of the government's assessed value of CDA's land and the process for setting that value. They argue that because the standard for determining property tax liability of agricultural land is productivity and not fair market value, the evidence was not relevant or probative on the issue of valuation. The point is without merit. Blue Springs did not ask about the assessed value of the property; it asked the witness for his opinion of the property's fair market value. Blue Springs introduced forms, entitled "Board of Equalization Assessed Value Appeal Form," which noted the difference between assessed value and fair market value. The form was also probative because CDA had expressed an opinion on it as to what it deemed the fair market value of its property to be.

### Conclusion

We conclude that the trial court properly excluded all testimony and evidence regarding the severance of water rights and the separate value of the water. It also properly excluded the testimonies of David Craig, William Davis, Jr., and Keith Wilson. Further, the trial court properly admitted evidence of the value of the Charity Tract and evidence of CDA's opinion submitted on tax forms of the fair market value of the land. We affirm the trial court's judgment.

All concur.