**Leslie R. CLAY, et al., Appellants,**

v.

**MISSOURI HIGHWAY AND TRANSPORTATION COMMISSION, et al., and Max Rieke & Brothers, Inc., Respondents.**

**No. WD 51894.**

Missouri Court of Appeals,
Western District.

June 30, 1997.

Motion for Rehearing and/or Transfer to Supreme Court Denied Sept. 2, 1997.

Application to Transfer Denied
Oct. 21, 1997.

G. Spencer Miller, Miller & Marske, Kansas City, for appellants.

John M. Cave, II, James M. Slone, Asst. Counsel, Judy L. Curran, Dist. Counsel, Mo. Highway and Transp. Comm., Kansas City, for respondents.

Before HANNA, P.J., and ELLIS and LAURA DENVIR STITH, JJ.

LAURA DENVIR STITH, Judge.

After a civil jury trial, plaintiffs Leslie and Alma Clay were awarded $19,640 from the Missouri Highway and Transportation Commission (MHTC) under a theory of inverse condemnation, and $22,340 from contractor Max Rieke & Brothers, Inc. (Rieke) under a theory of strict liability for blasting, for property damage caused by the blasting of rock during construction of a nearby road. The Clays alleged that the blasting damaged their property by damaging an aquifer that had been supplying unusually high quality water to their property.

The Clays appeal the trial court's refusal to submit a negligence claim against either defendant, refusal to submit a strict liability for blasting claim against MHTC, and refusal to submit an inverse condemnation claim against Rieke. Rieke cross-appeals the trial court's decision to allow the Clays to submit a strict liability for blasting claim against it, alleging that Plaintiffs failed to prove that the blasting caused their damage or trespassed on their property. We find that the trial court properly submitted only a strict liability for blasting claim against Rieke and only an inverse condemnation claim against MHTC.

The Clays also appeal the damage award, alleging that the trial court erred in exclud-

ing evidence of lost future profits, the independent value of their lost water, and lost use of the water. We find that the trial court properly refused to admit the evidence of lost profits because it was speculative, and that the trial court properly refused to separately submit damages to the Clays from loss of the water itself because such damages were subsumed within the submission of the property's loss of fair market value. We agree with defendants claims on cross-appeal, however, that the damage awards against the two defendants, which were several rather than joint and several, were duplicative of each other because both awarded damages for the same loss of fair market value of the property. We also find that because of the peculiar facts of this case this error can be corrected without requiring a new trial on damages. Accordingly, we remand for entry of an amended judgment in accordance with the principles set out in this opinion.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Leslie R. Clay, Jr. and his wife Alma Clay are residents of Tiffany Springs, Missouri. Their residence in Tiffany Springs sits above an aquifer. This aquifer had supplied a well on their property with unusually high-quality drinking water since 1945.

In November 1989, roadwork began on Highway 152 in the Tiffany Springs area. MHTC hired Rieke to cut the right of way for the new highway down to a grade specified by MHTC. Rieke used explosives to break up and remove rock from the roadway site. MHTC had anticipated that Rieke would use explosives to blast away rock, but had not specifically required the use of explosives in its contract.

Rieke tried to blast in a controlled fashion. Specially-placed explosive charges cut the rock and left smooth walls of rock for the sides of the highway. At trial, some experts testified that this controlled blasting only caused shock waves to move about twenty feet into the rock. The Clays alleged, however, that the blasting caused vibrations at their home some .85 miles away and that it affected the quality and quantity of the water coming from the aquifer. More specifically, they alleged that due to cracks in the aquifer caused by the blasting, sediment such as sand and oil contaminated the aquifer and, ultimately, their well-water, that the water level of their well dropped, and that the water flow in their well was drastically reduced.

The Clays brought suit against the MHTC and Rieke. They sought recovery against both defendants under three alternative theories: (1) that both defendants were strictly liable for blasting for any damage to the common aquifer and percolating waters, and the resulting damage to the Clays' property, (2) that the blasting resulted in inverse condemnation because, by damaging the common aquifer and percolating waters, the defendants wrongfully appropriated the Clays' property; and (3) that both defendants were negligent in locating and constructing the highway so that it cut through and damaged the common aquifer and percolating waters. The Clays sought damages under each theory of recovery for the loss of value to their real property, the cost and future cost of purchasing and hauling water, and the loss of the future intended use of their real property for agricultural purposes (as a vegetable farm) because of the pollution and diminished supply of their well water. Mr. Clay testified that the inability to start a farm on the land cost him $250,000 in profits. Defendants presented evidence that the alleged damage to the land caused a maximum of $12,700 in damages. Each party attacked the credibility of the other's figures.

The court eventually found that the Clays had failed to make a submissible case of negligence against Rieke, that the Clays were not entitled to submit an inverse condemnation claim against the Rieke since it was not a public entity, and that the Clays could not submit a strict liability or negligence claim against MHTC because it is a public entity and no exception permitting suit applied. The court allowed the Clays to submit a claim against MHTC for inverse condemnation. The damage instruction for the inverse condemnation claim against MHTC was modeled after MAI 9.02, and provided:

You must award plaintiffs such sum as you believe was the difference between the fair market value of plaintiffs' whole property immediately before the taking in December, 1989 and the value of plaintiffs' remaining property immediately after such taking, which difference in value is the direct result of the taking and of the uses which defendant has the right to make of the property taken.

The court also allowed the Clays to submit a claim against Rieke for strict liability for blasting. The damage instruction for this claim was modeled on MAI 4.02 and included the optional loss of use tail:

If you find in favor of plaintiffs, then you must award plaintiffs such sum as you may find from the evidence to be the difference between the fair market value before it was damaged and its fair market value after it was damaged, plus such sum as you may find from the evidence will fairly and justly compensate plaintiffs for the loss of use thereof during the time reasonably necessary for the property to be repaired or replaced.

The Clays had also sought to submit loss of use damages against MHTC and to present lost profits and the lost value of the water itself. The court found evidence of the lost value of the water itself was not recoverable as a separate item of damage, but rather was a part of the submission for loss of fair market value of the property. It also found that lost profits from the proposed vegetable farm were too speculative to be admitted. The Clays made an offer of proof in which they described the water quality they had enjoyed before the blasting, the decline in water quality after the blasting, Mr. Clay's plans to start a vegetable farm after he retired, how his plans were ruined by the decline in the well water's quality, and his damage estimate of $250,000.

The jury returned a verdict in favor of the Clays and awarded them damages of $19,640 against MHTC and $22,340 against Rieke. The Clays appeal the trial court's refusal to let them offer evidence of the other items of damage listed above, its refusal to let them submit negligence claims against either defendant, and its refusal to let them submit an inverse condemnation claim against Rieke. The defendants cross-appeal the verdicts, arguing that they are duplicative of each other and that the damage awards are not supported by the evidence. Rieke also argues that the Clays failed to make a submissible case of strict liability for blasting because they failed to show an actual trespass on their land and failed to prove there was a diminution in the fair market value of their property.

## II. CLAIMS SUBMISSIBLE AGAINST RIEKE

As noted above, the court allowed the Clays to submit a strict liability for blasting claim against Rieke, but granted Rieke a directed verdict on the theories of negligence and inverse condemnation. Each party appeals the rulings contrary to its position.

### A. Submissibility of Strict Liability for Blasting

Rieke claims that the trial court erred in submitting the Clays' strict liability for blasting claim against it because they failed to plead facts showing that vibrations or concussions from the blasting entered their property and caused the alleged damage to their well. Rieke argues that proof of trespass is a necessary element of a claim of strict liability for blasting. Second, Rieke argues that the Clays failed to set forth sufficient evidence that its actions caused any damage—whether or not in the form of trespass—to the Clays' property. In response, the Clays argue that they presented a submissible strict liability for blasting claim because they presented testimony that vibrations were felt and concussions heard that coincided with the physical damage to their well, thus proving both damage and trespass, and further that separate and apart from this evidence their land was damaged by the blasting because the blasting damaged their well and their water supply.

■ To the extent that Rieke is arguing that a claim of strict liability for blasting is necessarily based on trespass, or that trespass must be submitted as a separate element of the cause of action, we disagree. As

noted in *Bennett v. Mallinckrodt, Inc.*, 698 S.W.2d 854 (Mo.App.1985), *cert. denied*, 476 U.S. 1176, 106 S.Ct. 2903, 90 L.Ed.2d 989 (1986), "[i]n blasting cases, ... a claim for strict liability is as valid a claim as a claim based upon nuisance or trespass." *Id.* at 868.

What Rieke really appears to be arguing, and what it asserted at the instruction conference below, is that indirect or consequential damage from blasting is not enough to support a strict liability for blasting claim. It asserts that in order to prove the element of damage from blasting one must prove direct damage by showing that the blasting caused either rocks or vibrations to enter the property, and the latter caused the damage. In keeping with this argument, Rieke offered an instruction that required the jury to find not only that Rieke engaged in blasting and that the Clays were damaged as a direct result of the blasting, but also that "vibrations or concussions resulting from the explosion entered plaintiffs' property" and that "the vibrations or concussions directly caused damage to plaintiffs' property."

We note that there was evidence to support the submission that vibrations or concussions resulting from the explosion entered the plaintiffs' property, for there was testimony that the Clays and their neighbors felt and heard the blasting. They also testified that they began to have problems with their water supply after the blasting. Thus, they do claim a trespass, and they do claim their damage resulted from the blast. What they do not claim, however, is that the vibrations or concussions which they felt directly caused their damage. Rather, they claim that the same blasting that caused the vibrations also, but separately, split and cracked rock outside their property, and that as a result, it caused a lowering of the water level in the entire aquifer, including that on their property, and polluted the aquifer that supplied their well.

■ We think that the trial court properly refused to require the Clays to prove that it was the vibrations or concussions from the blasting that directly caused their damage; they were required to submit only that it was the blasting that caused their damage. We so rule because we conclude from a review of the history of the doctrine of strict liability for blasting that, while such a claim may be established by proof of vibration and concussion, *see Wiley v. Pittsburg & Midway Coal Mining Co.*, 729 S.W.2d 228, 232 (Mo.App.1987), it may also be established by other methods of proof.

■ The doctrine of strict liability for abnormally dangerous activities such as blasting originated in the English case *Rylands v. Fletcher*, 1 L.R.-Ex. 265 (1866), *aff'd*, 3 L.R.-E. & I App. 330 (1868). Missouri applies the "true rule," or narrow rule, of *Rylands v. Fletcher*. As *Rylands v. Fletcher* is narrowly applied in Missouri, a person is strictly liable "when he damages another by a thing or activity unduly dangerous and inappropriate to the place where it is maintained, in the light of the character of that place and its surroundings." *Bennett*, 698 S.W.2d at 867 (quoting Prosser, Law of Torts § 78, at 508 (4th ed.1971)); *Richardson v. Holland*, 741 S.W.2d 751, 755 (Mo.App.1987). The narrow application of the rule means that the activity (1) must be an activity relating to land or other immovables and (2) must itself cause the injury and the defendant must have been engaged directly in the injury-producing activity. *Richardson*, 741 S.W.2d at 755 (explaining the imposition of strict liability on abnormally dangerous activities in Missouri). Sections 519 and 520 of the Restatement (Second) of Torts (1977) also reflect this narrow application of *Rylands v. Fletcher*. *See Bennett*, 698 S.W.2d at 867. The Restatement limits strict liability for abnormally dangerous activities "to the kind of harm, the possibility of which makes the activity abnormally dangerous." Restatement (Second) of Torts § 519.

■ The potential that blasting might cause widespread damage to other people's property is precisely the reason that liability is imposed on users of explosives without regard to their negligence. As a general rule, under a theory of strict liability for blasting defendants are liable for any damage caused by the blasting, irrespective of their negligence. *Wiley.*, 729 S.W.2d at 232; *Donnell v. Vigus Quarries, Inc.*, 526 S.W.2d 314, 316 (Mo.App.1975); *Summers v. Tavern*

*Rock Sand Co.*, 315 S.W.2d 201, 203 (Mo. 1958); *Richards v. C.B. Contracting Co.*, 395 S.W.2d 737, 739–40 (Mo.App.1965). Plaintiffs must present evidence that the blasting was of sufficient capacity to have caused the damage. This evidence may be circumstantial. *Wiley*, 729 S.W.2d at 232; *Donnell*, 526 S.W.2d at 316.

Certainly, in most cases involving damage from blasting, plaintiffs will make their case for damages by presenting testimony that rocks landed or vibrations or concussions were felt coincidentally with the blasting and that physical damage was observed thereafter as a result of the vibrations or concussions. *Wiley*, 729 S.W.2d at 232. But Rieke cites no cases that state that these are the only ways to show that blasting caused physical damage to the property. In contrast, our own research has identified a number of cases from other jurisdictions which have permitted submission of a strict liability for blasting theory based on damage to water supply in plaintiff's property without regard to trespass

The most analogous case is *Bumbarger v. Walker*, 193 Pa.Super. 301, 164 A.2d 144, 149 (1960). In *Bumbarger*, landowners brought a trespass action against defendants who were conducting a strip mining operation. The defendants' strip mine was approximately 2,250 feet from, and at a higher elevation than, a spring used by the landowners for their water supply. The plaintiffs alleged that water with a high sulphur content that the defendants used in the mine had flowed into their spring and rendered it unfit for use. They presented testimony that there had been blasting and drilling at the mine, that water disappeared from the bottom of the mine after the blasting, that the ground and underground rock strata sloped downward from the mine to the spring, that local home owners felt concussions and suffered some direct damages from the blasting, and that their spring was fed by subterranean percolating water.

The Superior Court of Pennsylvania found that the plaintiffs' evidence was sufficient for a jury to find that the defendants' blasting and removal of the water from the mine altered underground geological structures in a manner that damaged the plaintiffs' spring. *Bumbarger*, 164 A.2d at 147. It relied on Section 519 of the Restatement of Torts (1938), which did not limit recovery for ultrahazardous activities to direct damages. As a general rule, it provided that:

> one who carries on an ultrahazardous activity is liable to another whose person, land or chattels the actor should recognize as likely to be harmed by the unpreventable miscarriage of the activity for harm resulting thereto from that which makes the activity ultrahazardous, although the utmost care is exercised to prevent the harm.

Restatement of Torts § 519 (quoted in *Bumbarger*, 164 A.2d at 148). *See also Opal v. Material Serv. Corp.*, 9 Ill.App.2d 433, 133 N.E.2d 733 (1956) (rejecting requirement of proof of trespass in blasting cases and extending strict liability for direct and consequential damages that are the natural and probable result of blasting); *Atlas Chem. Indus., Inc. v. Anderson*, 514 S.W.2d 309 (Tex.Civ.App.1974) (imposing strict liability where defendant intentionally discharged pollutant into stream and holding defendant liable for all foreseeable damages resulting from the pollutant), *aff'd in part and rev'd on other grounds*, 524 S.W.2d 681 (Tex.1975); *Branch v. Western Petroleum, Inc.*, 657 P.2d 267 (Utah 1982) (applying strict liability to nontrespassory injuries to plaintiff's wells caused by the defendant's pumping of polluted water into its own oil wells and the subsequent percolation of the polluted water into the subterranean water supply).

Policy considerations support such imposition of strict liability for blasting even though no physical invasion of the premises has taken place. Neither an industry nor the State should be allowed to use its property in an abnormally dangerous way that injures the property of its neighbors with impunity, because to do so is effectively an appropriation of the neighbor's property for the industry or State's use. The blaster, and not the wholly innocent party, should assume the costs of its blasting. *See Atlas Chem. Indus.*, 514 S.W.2d at 316 (characterizing the damage inflicted on other people's property as in-

verse condemnation); *Branch,* 657 P.2d at 275.

We think these principles have application here, where the Clays similarly claim that the blasting caused physical damage to their property by damaging the rock formations underlying nearby property, thereby causing injury to the aquifer or to other subterranean aspects of the property in question. They presented expert testimony by Dr. Paul Hilpman, a Professor Emeritus of Geology at the University of Missouri and the Director of the Center for Underground Studies, to support this theory. He testified that the blasting damaged geological structures that resulted in the contamination of the Clays' well. Dr. Hilpman testified that the blasting fractured rock and sandstone layers in the aquifer and that these fractures in turn caused the water table to drop and allowed oil to migrate up into the water-producing area of the rock strata. This resulted in a lower water level in the Clays' well and in pollution of their well water. This type of damage is equally serious and equally likely to affect the value of property as is damage caused by vibrations or concussions on the property. We find the Clays' proof of damage was sufficient to support their strict liability for blasting and inverse condemnation claims.

### B. Proof of Causation

■ Rieke also argues that any damage to the aquifer was not caused by the blasting, but rather by the fact that the road had to be dug to a level which required penetration of numerous layers of rock and sediment. It argues that even if it had dug the road by hand, it eventually would have had to break through the same layers of rock, and the same lowering and contamination of the aquifer would have occurred. Thus, it argues, the injury (if any) was not from the blasting but from the design and location of the road, matters which were in MHTC's control, and as to which Rieke had no input or discretion.

While the jury might have agreed with this interpretation of the evidence, there was also

evidence that the blasting itself caused more severe fracturing of the rock strata than would have been caused by other methods of digging. Dr. Hilpman testified that some of the rock had to be blasted and that the blasting would cause more subterranean fracturing than simple cutting. He also testified that the oil showed up in the Clays' well because it was able to migrate up into the water zone through fractures in a limestone layer that were caused by blasting. While the evidence on this point was not extensive, the jury apparently accepted it and it was adequate to support the jury's verdict.

### C. Diminution of value

Rieke also argues that the Clays failed to make a submissible case because they failed to offer sufficient evidence that there was a diminution in fair market value of their property, and further that the evidence did not support the amount of the jury's verdict.

■ We disagree. Rieke's position is based on its argument that the only evidence of fair market value was (1) its own appraiser's testimony that the difference in fair market value of the Clays' property before and after the blasting was $12,700, and (2) Mr. Clay's testimony that his property did not have any fair market value prior to the blasting because of its zoning and proximity to Kansas City International Airport. Rieke argues that Mr. Clay's testimony necessarily implied that the water problems did not affect the fair market value of the property and so that defeated the Clays' own claim.

■ While Mr. Clay's testimony did not help his position, he clarified that he meant that the home had little or no value as a residence due to its location near the airport, but that it would have considerable value as a farm. In addition, on cross-examination Rieke's appraiser admitted that his appraisal was incomplete in that he had not considered some relevant facts in reaching his $12,700 figure.[1]

---

1. The Clays claim that the appraiser's report should not have been admitted at all because it was hearsay. We do not reach this issue, because the Clays have failed to include the ap-

praiser's report in the record on appeal. As Rieke notes, an appellant's failure to make exhibits that are claimed to have been improperly admitted a part of the appellate record precludes

More specifically, the appraiser testified that because fair market value is based on the "highest and best use" of the "next most likely buyer," and because he had determined that the "highest and best use" of the "next most likely buyer" to be as a "suburban residence with small acreage," he did not determine whether the property had any incidental agricultural use that should be reflected in its value. He admitted that if the well water had some unique characteristics it might enhance the property value. He also admitted that he had not given the well water any special value because of its favorable chemical balance, had not specifically checked a water bill for the property, had not considered the $2,800 cost to hook-up to the city water line once the well was polluted, had not considered the "storm water charge" on the water bill, and had not considered that such factors could affect the property value.

The evidence was sufficient to support the jury's determination that the blasting caused a decrease in fair market value of the Clay's property in the $19,640 amount found by the jury.

### D. Refusal of Trial Court to Submit Theories of Negligence and Inverse Condemnation Against Rieke

The Clays claim that the court erred by granting a directed verdict on their negligence claim against Rieke. They argue that they made a submissible case of Rieke's negligence by establishing that Rieke had a duty not to injure them while blasting, that Rieke breached that duty by damaging the aquifer when it blasted, and that the blasting caused the damage.

Rieke argues that, to the contrary, the Clays did not prove negligence. It points out that the Clays' counsel, when asked by the trial judge to summarize the evidence of negligence against Rieke, stated simply that he had asked Mr. Rieke questions about what a contractor should do when water is

encountered on the job and whether the water would be visible and that Mr. Rieke said that the presence of water should be brought to the attention of the people involved. Counsel then stated that there was no evidence that Rieke had notified anyone, and counsel concluded by saying "that would be the only thing that I would say, the only evidence on that point from that standpoint." The trial judge then sustained Rieke's motion for directed verdict.

■■■ Rieke argues that this evidence was inadequate to support the Clays' negligence claim. We agree. A negligence claim has four elements: (1) a legal duty to conform to a certain standard of conduct to protect others against unreasonable risks; (2) breach of the duty; (3) proximate cause; and (4) actual damages. *Bickerton, Inc. v. American States Ins. Co.*, 898 S.W.2d 595, 600 (Mo.App. 1995). Even assuming the Clays offered evidence of elements 1, 3, and 4, they failed to prove breach of any duty, for they offered no evidence that Rieke actually knew that there were aquifers in the area and offered no expert testimony that a contractor such as Rieke should have known that its controlled blasting could damage the aquifer.

■■■ In any event, the damages claimed by the Clays against Rieke under their negligence claim are the same as the damages they claim against Rieke under their strict liability for blasting claim, and the jury found for the Clays on their strict liability claim. Therefore, no prejudice could have resulted from the failure to submit a negligence claim in the alternative.

The Clays also argue that the trial court erred in refusing to submit a claim for inverse condemnation against Rieke because in *Tierney v. Planned Indus. Expansion Auth. of Kansas City*, 742 S.W.2d 146 (Mo. banc 1987), the Supreme Court of Missouri permitted inverse condemnation claims to be brought against private entities. First, we

review of the propriety of the trial court's ruling. *State ex rel. Missouri Highway & Transp. Comm'n v. Gannon*, 898 S.W.2d 141, 144 (Mo.App.1995). But were we to reach the merits of the Clays' argument, we would find that its admission was harmless because the report was merely cumulative of other similar evidence admitted without

objection. *Dunn v. St. Louis–San Francisco Ry. Co.*, 621 S.W.2d 245, 252 (Mo. banc 1981), *cert. denied sub nom. Burlington N. R.R. Co. v. Dunn*, 454 U.S. 1145, 102 S.Ct. 1007, 71 L.Ed.2d 298 (1982); *State ex rel. Missouri Highway & Transp. Comm'n v. McDonald's Corp.*, 896 S.W.2d 652, 655 (Mo.App.1995).

note that, even if this were true, the Clays' claim of damages for inverse condemnation would simply have duplicated their claim under strict liability for blasting, and thus no prejudice could have resulted from failure to submit this claim either.

■ Even more basically, however, *Tierney* itself shows the Clays are wrong in claiming that an inverse condemnation claim lies against a purely private entity such as Rieke. In that case, the plaintiffs-landowners sought recovery of damages for the taking of their land by inverse condemnation in an area-wide redevelopment scheme. They sued the city, the public agency empowered to enact redevelopment plans, the developer, an individual partner in the developer, and a non-profit corporation. Our Supreme Court concluded that since the developer, partner, and non-profit corporation had no governmental powers and no power of eminent domain, they could not be held liable for a taking under an inverse condemnation theory in their own right or simply because they had entered into a contract with a government agency on a matter within the agency's statutory authority. *Id.* at 155. In reaching its conclusion, the Court noted the negative consequences for governmental development projects of an alternative ruling.[2]

Like the developer, partner, and non-profit corporation in *Tierney*, Rieke was hired by a government agency and did not have any governmental powers, such as the power of eminent domain. Therefore, the Clays' inverse condemnation claim against Rieke was properly dismissed.

## III. CLAIMS SUBMISSIBLE AGAINST MHTC

The Clays also argue that the trial court erred in refusing to submit their negligence and strict liability for blasting claims against MHTC. They argue that they properly pleaded a negligence claim under the "dangerous condition" exception to sovereign immunity. *See § 537.600.1(2), RSMo 1986.*

■ We disagree. The Clays' only claim against MHTC for their property damage was their inverse condemnation claim. In *Heins Implement Co. v. Missouri Highway & Transp. Comm.*, 859 S.W.2d 681 (Mo. banc 1993), the Supreme Court of Missouri held that:

> "when private property is damaged by a nuisance operated by an entity having the power of eminent domain, the proper remedy is an action in inverse condemnation. . . . The fact that the nuisance is alleged to have been caused by the public entity's negligence is immaterial."

*Id.* at 693 (citations and footnote omitted). Our Supreme Court went further and stated that "[i]nverse condemnation is *the* proper remedy *whenever* a condemning authority takes or damages private property for a public use without just compensation." *Id.* at 693 n. 18 (emphasis added). It found no error in the trial court's granting of summary judgment on the plaintiffs' nuisance and negligence claims. *Id.* at 694. Correspondingly, in the present case we find no error in the trial court's refusal to submit the Clays' negligence and strict liability claims against MHTC.

The Clays argue that the present case is similar to *Byrom v. Little Blue Valley Sewer Dist.*, 825 S.W.2d 304 (Mo.App.1991), in which we allowed a damage claim by landowners against a public sewer district. However, *Byrom* is distinguishable from the present case. In *Byrom* the petition alleged that the district fell within the "dangerous condition" exception to sovereign immunity. We found that the allegations in the petition that the sewer plant was defectively constructed and, therefore, that sewage was discharged into the surrounding land, air, and water,

---

**2.** *See also Page v. Metropolitan St. Louis Sewer Dist.*, 377 S.W.2d 348, 354 (Mo.1964) (stating that the takings clause in the state constitution "is binding upon the state as well as others having the power of eminent domain"); *Dulany v. Missouri Pac. R.R. Co.*, 766 S.W.2d 645, 648 (Mo.App.1988) (defining inverse condemnation as "a cause of action *against a governmental agency* to recover the value of property taken by the agency, though no formal exercise of the power of eminent domain has been completed)" (emphasis added); *Black's Law Dictionary* 825 (6th ed.1990) (defining inverse condemnation as "[a]n action brought by a property owner seeking just compensation for land taken for a public use, *against a government or private entity having the power of eminent domain. . . .*") (emphasis added).

were sufficient "to allege a dangerous condition *in* the [d]istrict's property," *Byrom,* 825 S.W.2d at 306 (emphasis added), not an injury to another's property. In this case, the Clays are seeking recovery for damages to their own property. In such cases, inverse condemnation has been held to be the exclusive and proper remedy.

## IV. THE PROPER MEASURE OF DAMAGES

### A. *Damages for Diminution in Value of Property*

■ We now turn to the issue of the proper measure of damages for the injury to the Clays' property. Missouri courts have previously considered the proper measure of damages for lost or limited access to subterranean percolating waters.[3] In condemnation proceedings, and in other cases dealing with damage to real or personal property, the proper measure of damages is usually the diminution in value of the property as measured by the difference between the fair market value of the entire property before the taking and its fair market value after the taking. *State ex rel. Missouri Highway & Transp. Comm'n v. Horine,* 776 S.W.2d 6, 12 (Mo. banc 1989) (condemnation proceeding); *Businessmen's Assurance Co. v. Graham,* 891 S.W.2d 438, 449 (Mo.App.1994) (damage to real property); *City of Blue Springs v. Central Dev. Ass'n,* 831 S.W.2d 655, 657 (Mo. App.1992) (condemnation proceeding).[4] In tort cases for property damage, plaintiffs may also recover damages resulting from loss of use of the property. The court below allowed the Clays to present evidence of such losses, and the damage instruction permitted the jury to award loss of use damages on the Clays claim against Rieke.[5]

■ The Clays argue, however, that they were also entitled to present evidence of additional damages which they suffered in the form of the independent value of their lost water rights and the value of the water itself, as additional, independent items of damage. They also say the trial court erred in preventing them from showing the profits they claim they will lose because they are unable to turn the property into a vegetable farm as Mr. Clay testified he had planned to do after he retired, and that the trial court erred in limiting their evidence of loss of use damages.

First, we note that the trial court did permit the Clays to offer evidence of loss of use damages, including evidence of expenses incurred between the pollution of their well water and the installation of the city water. In accordance with this ruling, the Clays presented evidence that Mr. Clay had hauled two six-gallon cans of water per day to his farm from the time the well water was polluted in February 1990 until city water was installed in October 1994, the cost of connecting to city water, and similar items of damage. The record confirms, however, that the trial court ruled that the Clays could not submit the fact that they no longer had the use of high quality well water as a separate item of damage in and of itself, and that it ruled such loss was relevant only as part of the facts the jury could consider in determining the lesser value of the real estate after the aquifer was damaged.

Missouri courts have previously outlined the elements that may be properly considered in determining fair market value in cases in which damage to water or water rights is alleged. In *City of Blue Springs,* 831 S.W.2d at 657, a landowner contested the damages awarded after the city condemned part of its land in order to drill a well and build a water works. We noted the general rule that any and all factors that have a

---

**3.** In *Higday v. Nickolaus,* 469 S.W.2d 859 (Mo. App.1971), we adopted the rule of "reasonable use" for subterranean percolating waters, but did not consider the proper measure of damages to be awarded in inverse condemnation actions. *Id.* at 872.

**4.** In a few situations, not claimed to be applicable here, the proper measure of damages is the cost of repair.

**5.** Rieke claims on appeal that loss of use damages should not have been submitted at all because the Clays did not properly plead them in their Petition. We find, however, that the Petition adequately pleaded loss of use.

present, quantifiable effect on market value are proper elements of damages to be considered in determining the affect of the condemnation on the market value of the property. *Id. See also Horine,* 776 S.W.2d at 12.

In *City of Blue Springs,* however, we rejected the landowner's claim that it should have been allowed to present separate evidence regarding the value of subterranean percolating waters. 831 S.W.2d at 659. We based our decision on the unique legal rights of landowners to subterranean percolating water. We noted that the nature of a landowner's property right in the water is usufructuary, not absolute. *Id.* at 658 (quoting *Higday v. Nickolaus,* 469 S.W.2d 859, 866 (Mo.App.1971)). This means that a landowner does not own subterranean percolating water, but can use the water he diverts freely "for any purpose incidental to his beneficial enjoyment of the land." *Id.* The landowner could convey his right to use the water, but not the water itself. *Id.* at 659. As a result of this legal relationship, we stated that while the "[v]alue of the water certainly was a factor for consideration in this case, ... we disagree with [the plaintiffs'] contention that the water value should have been separated from the overall land value." *Id.* at 657.

Similar distinctions have been drawn in other water-law cases which have considered how to determine fair market value. In *Lewis v. City of Potosi,* 317 S.W.2d 623 (Mo.App. 1958), the St. Louis Court of Appeals ruled that the loss of cattle by a landowner due to the city's pollution of a stream running through his property should not have been considered in a claim styled as a condemnation proceeding. The court stated that in determining the fair market value of the land, damages are confined to the diminished value of the land. *Id.* at 629.

In *Ingram v. Great Lakes Pipe Line Co.,* 153 S.W.2d 547 (Mo.App.1941), the Kansas City Court of Appeals, held that a jury instruction in an action to recover permanent damages to real estate due to blasting was improper because it allowed the jury to award double damages for the depreciation in the fair market value of the farm on which it was located and for the permanent loss of a

spring. *Id.* at 555. The court stated that "having submitted to the jury the question of the depreciation of the market value of the land, [the plaintiff] is not entitled to the expenses she has been, or in the future will be, put to in getting water elsewhere, ..." *Id.*

These cases provide clear support for the trial court's ruling that the Clays could not separately submit the value of the water itself and the value of their lost water rights. The Clays are not entitled to damages for the value of the water itself because they did not have an absolute right to the water in the aquifer. In addition, the Clays are not entitled to damages for the value of their lost water rights because, to the extent that those damages could be considered, they were already included in the diminution in fair market value of their property that the jury determined.

### B. Damages for Lost Profits

The Clays also argue that they should have been allowed to present evidence of lost profits. First, we note that their claim they are entitled to separately submit lost profits is just another way of arguing that they should be able to separately recover for the lost water itself. They claim that the reason they lost profits is because the loss of the water decreased the value of the property for agricultural uses. If this is true, then such damages should have been considered, if at all, in determining the value of the property for this use before the blasting, and the diminution in value of the property for this use after the blasting. They should never be a separate item of damage.

Even more basically, however, the trial court properly excluded the Clays' lost profits evidence on the basis that it was too speculative. A right to recover for lost future profits is not easily shown. In most cases, the courts hold that anticipated profits of a yet-to-be established commercial business are too remote, speculative, and dependent upon changing circumstances to warrant recovery. *Anuhco, Inc. v. Westinghouse Credit Corp.,* 883 S.W.2d 910, 923 (Mo.App. 1994). They are recoverable "only when

they are made reasonably certain by proof of actual facts which present data for a rational estimate of such profits." *Id.*

Applying this rule in *City of Blue Springs,* we rejected the landowner's claim that he should have been allowed to present evidence at trial that the city's pumping would diminish water quality and prevent any future owner of the remaining land from operating a water company. 831 S.W.2d at 659. We noted the rule that alleged damages must be direct and certain at the time of the appropriation to be considered when ascertaining damages and reasoned that the evidence of damages to the water's quality and future water sales was too remote and speculative to allow presentation of such evidence because the landowner had not yet established a water company and had no potential customers. *Id.* at 660–61.

In the present case the Clays also failed to present sufficient evidence of their anticipated profits to make them reasonably certain. Mr. Clay testified that he made about $2,500 each year by cultivating 600 tomato plants a year, that his future plan was to expand his garden to 5,000 tomato plants a year, and that he personally valued his lost right to use the well water as he pleased at $250,000. Mr. Clay's projections were based on his retirement plans and hopes of becoming a commercial vegetable farmer. He did not present substantial evidence that he had a market for his anticipated future produce, presented no evidence of anticipated expenses, start-up costs or costs for machinery, delivery, employees, and so forth. While Mr. Clay may have hoped to use his good well water to make money as a farmer, any such enterprise was mere speculation at the time the blasting occurred. The trial court properly refused to submit lost profits.

#### C. Double or treble damages.

Finally, the Clays claim that they were entitled to either double or treble the damages awarded by the jury. In support, they cite to Section 537.330 and 537.340, RSMo 1994.[6] These sections permit the recovery of double or treble damages in certain types of trespass actions in which malicious conduct is shown. Section 537.330 states:

> If any person shall maliciously or wantonly damage or destroy any personal property, goods, chattels, furniture or livestock, the person so offending shall pay to the party injured double the value of the things so damaged or destroyed; and upon an affidavit that said damage or destruction was wantonly or maliciously done, it shall be a good ground for an attachment to issue, as in other cases by attachment.

Section 537.340 states:

> If any person shall ... carry away any stones, ore or mineral, gravel, clay or mold, or any ice or other substance or material being a part of the realty, ... the person so offending shall pay to the party injured treble the value of the things so injured ... with costs.

The trial court ruled that the Clays were not entitled to double or treble their damages against either defendant under either theory, for they had failed to submit essential elements of those theories, such as wanton and malicious behavior. While we agree with this ruling, we also find that, basically, the Clays simply never pleaded a claim under either of these theories in their Petition against either defendant. Shortly before trial, they did seek leave to amend their First Amended Petition by interlineation to add such a claim to their strict liability for blasting theories against MHTC and Rieke. However, they never actually tendered an amendment to their claim against Rieke and, as noted above, the Clays' strict liability for blasting claim against MHTC was properly dismissed before trial. Thus, the trial court denied the motion to amend by interlineation. The case thus went to trial without any prayer for double or treble damages, and these issues were not tried by consent.

6. The Clays also cite to Section 577.150 in their reply brief as additional authority for doubling damages. By raising the argument based on Section 577.150 for the first time in their reply brief, the Clays have not properly preserved the issue for review. *Stewart v. Sturms,* 784 S.W.2d 257, 260 (Mo.App. banc 1989); *See In re Estate of Caldwell,* 794 S.W.2d 257, 260 (Mo.App.1990) ("Issues submitted in an appellant's brief cannot be enlarged by presentations in a reply brief.").

After trial the Clays filed motions asking the court to double or treble the damage award. They did not cite the trial court, and have not cited this Court, to any authority to support their right to file such motions after trial, however, and we find none.[7] To the contrary, prior cases have held that Sections 537.330 and 537.340 provide statutory alternatives to the assessment of punitive damages. They supplement the traditional common law cause of action for trespass, and require their own distinct elements of proof. *See State ex rel. Smith v. Greene*, 494 S.W.2d 55, 58–59 (Mo. banc 1973) (finding no clear legislative intent to have the statutes abrogate the common law of trespass). *See also* § 537.330 (requiring proof of "malicious or wanton" damage); § 537.340 (requiring proof of the "carrying away" of "parts of the realty"); *Fondren v. Redwine*, 905 S.W.2d 156, 157 (Mo.App.1995) (requiring plaintiffs to provide evidence that a defendant "trespassed" on their property in order to make a submissible case under § 537.340). Claims under either of these statutes must be included in petitions, just as punitive damage claims must be included in petitions rather than sought by post-trial motion. *See Greene*, 494 S.W.2d at 58–59; *Walther v. Warner*, 26 Mo. 143, 146–49 (1858) (considering a statutory predecessor to Section 537.340 and holding that the trial court could not treble the damages awarded by the jury where the plaintiff failed to request relief pursuant to the statute in his petition).

Because the Clays failed to plead facts or theories entitling them to recover under the doubling or trebling statutes and "a party cannot recover for a cause of action not pleaded," *Browning–Ferris Indus. of St. Louis, Inc. v. Landmark Systems, Inc.*, 822 S.W.2d 569, 571 (Mo.App.1992),[8] we affirm the trial court's refusal to double or treble damages.

### D. Separate Damage Instructions and Verdict Forms.

Rieke also claims that the trial court erred in submitting separate damage instructions and verdict directors for each defendant. It contends that a single form of verdict should have been used and the damage award apportioned, and that the use of two verdict directors allowed the jury to award double damages.

The Clays disagree. They argue that Rieke failed to preserve the issue of double damages by failing to set it out specifically in its new trial motion. We find that Rieke preserved this issue by objecting to the damage instructions at trial on the this specific ground, and then by raising the issue generally in its motion for new trial. This was sufficient where, as here, it made a definite objection during trial. *See* Rule 78.07; *State ex rel. Missouri Highway & Transp. Comm'n v. Jim Lynch Toyota, Inc.*, 830 S.W.2d 481, 488 (Mo.App.1992).

The Clays also argue that the trial court properly entered judgment separately against each defendant because the causes of action against each defendant were pleaded and submitted separately. They note that they did not plead the defendants were joint tortfeasors or seek to impose joint and several liability. This is all true, but it does not address the key problem raised by Rieke that, even if the Clays' theories were distinct, their damages were not. As to both defendants, the Clays sought damages for the diminution in fair market value of their property from the blasting. Any such loss of value was the same under all pleaded theories, for under each such theory the damage-causing event was the blasting and the damage was the same loss in fair market value.

MAI anticipates that situations may arise in multi-defendant cases in which overlapping damages are requested under sepa-

---

7. In addition, we note that the Clays' post-verdict motion to double damages did not specify which of the verdicts they wanted doubled. In contrast, their post-verdict motion to treble damages specifically limited their motion to the verdict against Rieke. Therefore, their claim for treble damages is also limited to Rieke on appeal.

8. *See also State v. Hall*, 867 S.W.2d 251, 254 (Mo.App.1993) (declaring that "[a]lthough a certain degree of flexibility is allowed in pleading a cause of action, a party cannot completely stray from a specifically pleaded statutory theory of recovery and claim that the theory intended was an altogether different statutory theory").

rate theories. MAI 2.00 notes that the proper way to submit damages in such cases will vary with the circumstances, and refers litigants to Illustrations set out in MAI 35.15, 36.02, 36.10 and 36.22 for guidance as to the various possible ways to submit such overlapping claims. Those Illustrations make clear that when submitting general verdict directors against multiple defendants could result in overlapping or duplicative damages, special interrogatories can be used. MAI 36.22 provides a good illustration of how to submit such special interrogatories.

This is the very type of procedure requested by Rieke here. We note, however, that its offered instruction was also wrong in that it wanted the jury to simply award a set amount of damages for loss of fair market value and then apportion that amount between the two defendants. This would be proper in a comparative fault case, but comparative fault does not apply when the submissions are inverse condemnation and strict liability for blasting, so that, as the Clays note, liability is not joint and several. The problem is not the failure to apportion damages, but the fact that the instructions as written permitted the jury to award the same damages twice.

The proper way to submit the damages would have been to ask the jury to determine the diminution in value, if any, from the blasting, and to separately determine the loss of use damages, if any, for which Rieke was responsible. These amounts would be separately recorded on the verdict form, in the manner suggested in MAI 36.22. Rieke would be liable for the loss of use damages, and both Rieke and MHTC would be separately liable for the entire amount of the diminution in value of the property, although of course the Clays could only recover that diminution in value once.

█ While the damage instruction and verdict form used in this case did not require the jury to separately set out its award for loss of use damages against Rieke, the unique nature of the damages claimed allows us to determine from the verdicts exactly what damages were awarded for loss of use and what damages were awarded for diminution in value without requiring remand for a new trial.

The damage instruction submitted against MHTC permitted the jury to award damages only for diminution in value. The jury awarded damages of $19,640. The damage instruction submitted against Rieke permitted the jury to award damages for both diminution in value and loss of use. The jury awarded damages of $22,340. A simple arithmetical computation reveals that the loss of use damages awarded were $2,700. Rieke argues as much in its brief on a related point.

Accordingly, we remand so that the trial court can modify the judgment below to clarify that while the Clays are entitled to recover $19,640 for diminution in value of their property from either MHTC or Rieke, they may recover this amount only once. It is, of course, up to them to decide whether to pursue all of the amount from one defendant or some from one and some from the other. In addition, the Clays are entitled to recover $2,700 in loss of use damages from Rieke only.

Affirmed as to liability and remanded for modification of the damage award in accordance with this opinion.

Remanded for further proceedings in accordance with this opinion.

All concur.